WILDER et al. v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 6, 1906.)

No. 559.

1. CRIMINAL LAW—WRIT OF ERROR—MATTERS REVIEWABLE.

An appellate court cannot review the ruling of a trial court in refusing to entertain a plea in abatement tendered by a defendant in a criminal case after a demurrer had been overruled and at a term succeeding the one at which defendant had entered a plea of not guilty; there being nothing in the record to excuse the delay or to show that the court abused its discretion.

2. CONSPIRACY—OFFENSE AGAINST UNITED STATES—OBSTRUCTING DUE ADMINISTRATION OF JUSTICE.

A conspiracy to corruptly obstruct and impede the due administration of justice in a court of the United States in a civil action between private parties, in violation of Rev. St. § 5399 [U. S. Comp. St. 1901, p. 3656], is a conspiracy to commit an offense against the United States within the meaning of Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], and is indictable thereunder.

3. OBSTRUCTING JUSTICE—ELEMENTS OF OFFENSE—FEDERAL STATUTE.

In Rev. St. § 5399 [U. S. Comp. St. 1901, p. 3656], making it a criminal offense, inter alia, to corruptly or by threats or force "obstruct or impede, or endeavor to obstruct or impede, the due administration of justice" in any court of the United States, the words "due administration of justice" import a free and fair opportunity to every litigant in a pending cause in a federal court to learn what he may learn (if not obstructed or impeded) concerning material facts, and to exercise his option as to introducing testimony as to such facts, and an offense is committed under such statute if a person corruptly endeavors to induce other persons who have knowledge of facts which may be material to a party to a pending cause to conceal or deny their knowledge, so as to prevent such party from obtaining knowledge or procuring evidence of such facts.

4. CONSPIRACY—SUFFICIENCY OF INDICTMENT.

An indictment under Rev. St. § 5440 [U. S. Comp. St. 1901, p. 3676], for conspiring to commit an offense against the United States by obstructing the due administration of justice in a court of the United States, in violation of Rev. St. § 5399 [U. S. Comp. St. 1901, p. 3656], considered, and held good.

Boyd, District Judge, dissenting.

In Error to the District Court of the United States for the Southern District of West Virginia, at Huntington.

The first count of the indictment in this case reads as follows:

"Indictment.

"United States of America, Southern District of West Virginia—ss.:

"In the District Court of the United States in and for the Southern District aforesaid at the April term thereof, A. D. 1903, at the city of Huntington, West Virginia.

"The grand jurors of the United States, impaneled, sworn, and charged at the term aforesaid of the court aforesaid on their oaths, do present, charge, and say:

"That heretofore, to wit, on the 21st day of April, 1902, one V. A. Wilder, whose name is unknown to the grand jurors aforesaid otherwise than V. A. Wilder and one Daniel Justus did, in the county of Kanawha, in the Southern District of West Virginia, and within the jurisdiction of said court, unlawfully, knowingly, corruptly, fraudulently and feloniously con-

spire, combine, confederate and agree together to commit an offense against the United States, in this, to wit:

"That on said last-named day, and for a long time prior thereto, and ever since there was and has been pending and undetermined in the Circuit Court of the United States for the Western District of the state of Virginia, in the Fourth judicial circuit, a certain action at law in ejectment in which the matter in dispute exceeds, and has always exceeded, exclusive of interest and costs, the sum and value of two thousand dollars, and which the said Circuit Court then and there and during the times aforesaid had and still has the lawful and proper jurisdiction to hear and determine, and which action in ejectment one Henry C. King, a citizen of the state of New York, instituted in said court against Henry C. Stuart, a citizen of the said state of Virginia, for the recovery of an estate in fee simple and the possession of certain land lying in the county of Buchanan, in said state of Virginia, which said county of Buchanan, before and at the time of the institution of said action in ejectment, and ever since was, has been and now is within and a part of the said Western District of the state of Virginia, and which land so sought to be recovered by said King in said action in ejectment was, at the time of the institution of said action and ever since has been claimed by said King to be a part of the land granted to one Robert Morris by the commonwealth of Virginia by patent dated the 23rd day of June, 1795, being as so claimed by said King that part thereof which lies in the said county of Buchanan. That at the time of the institution of said action in ejectment the said Stuart claimed, and has ever since claimed, an estate in freehold in and to certain lands in said county of Buchanan, which the said King at the time of the institution of said action in ejectment claimed, and has ever since claimed to be partly within the boundaries of the land set out and described in the said patent from the commonwealth of Virginia to the said Robert Morris, but how much of the land so claimed by the said Stuart is within the boundaries of the land set out and described in said patent and the true location of the boundaries of the land embraced in said patent were, at the time of the institution of said action in ejectment and ever since have been matters in dispute and controversy of more than two thousand dollars in value, exclusive of interest and costs in said action in ejectment between the said King and said Stuart.

"That in the declaration filed by said King in said action of ejectment is set out the location as claimed by him of the boundaries of the land embraced in said patent which includes a large part of the land so claimed by said Stuart, and the said Stuart has always, since the institution of said action in ejectment, claimed and still claims, that the location of the boundaries of the land embraced in said patent as set out by the said King in his said declaration is not the true location and that the true location of the boundaries of the land embraced in said patent would include a much smaller quantity of the land so claimed by said Stuart than is embraced by the location thereof claimed as aforesaid by the said King in his said declaration. That the said action in ejectment was so instituted by the said King against the said Stuart for the purpose of establishing title in fee in said King to the land embraced in said patent which lay in the said county of Buchanan, and to recover from the said Stuart that part of the land so claimed by him, which the said King claimed as aforesaid to be within the boundaries of the land embraced in said patent, and that at the time of the institution of said action in ejectment and ever since the said King claimed and has claimed to be the owner in fee-simple estate and entitled to the possession of that part of the land embraced in said patent which lies in the said county of Buchanan and according to the location thereof as set forth in his said declaration. That shortly after the institution of said action in ejectment, and long prior to the 21st day of April, 1902, to wit, at rules held in the clerk's office of said court on the first Monday in January, 1898, the said Stuart appeared to said action in ejectment, and the said Stuart shortly after the institution of said action of ejectment and long prior to the 21st day of April, 1902, to wit, at rules held

in the said clerk's office as aforesaid and at the June term, 1898, of the said court by proper plea interposed in his behalf put in issue the right of the said King to recover in said action in ejectment the land so sought to be recovered by him therein, and said issue has ever since remained between the said King and the said Stuart as a matter in controversy between them to be tried and determined in and by the said Circuit Court of the United States for the Western District of the state of Virginia, and said issue now remains pending and undetermined in said court, and that ever since said action in ejectment was instituted in said court, the said Stuart has controverted and denied and still controverts and denies the right of the said King to recover therein the land so sought to be recovered by him therein as set out in his said declaration, and that said action in ejectment is still pending and undetermined in said court, and that at the time of the institution of said action of ejectment the said King was a citizen of the state of New York and the said Stuart a citizen of the state of Virginia, and they have ever since been citizens of different states, and that at the time of the institution of said action in ejectment and ever since the said Circuit Court of the United States for the Western District of the state of Virginia has had the due and lawful jurisdiction to hear and determine all matters in controversy in said action in ejectment between the said King and the said Stuart and still has such jurisdiction. That the said patent dated the 23rd day of June, 1795, from the commonwealth of Virginia to Robert Morris in describing the land granted thereby designates one of the corners of the said land as, and states the name to be 'three poplars and a sugar tree by a small branch of Knox creek.' That ever since said action of ejectment was instituted it has been and now is material and important to said Stuart and of great value to him in defending said action in ejectment, and in contesting the location of the boundaries of the land embraced in said patent as claimed by said King, and set forth in his said declaration, and to show that of the land so claimed by said Stuart a much less quantity is within the boundaries of the land embraced by said patent than is claimed by said King in said declaration and to establish the true location of said boundaries, to show and prove in any trial in said action that said corner so designated as 'three poplars and a sugar tree by a small branch of Knox creek' was located near what is known as the Race Fork of Knox Creek in said Buchanan county, the said Race Fork being a small branch of Knox Creek, and that ever since the institution of said action of ejectment it has been and now is material and important and of great value to the said King in order to recover in said action the lands sought to be recovered therein by him as aforesaid, to show and prove in any trial in said action that said corner so designated as aforesaid was not located on or near said Race Fork of Knox Creek. That certain persons residing in said county of Buchanan, to wit: Riley Lester, William A. Lester, Miles Lester, Andrew Baker, George Childers, Jacob Lester, John Charles, Hiram Smith, Calvin Lester, and the said Daniel Justus had many years prior to the 21st day of April, 1902, to wit: seven years prior thereto seen certain marked poplar trees not over three in number, and a marked sugar tree. standing near together, and near said Race Fork of Knox Creek, in said Buchanan county, and within a short distance, to wit: 400 feet of the house where the said Daniel Justus resided on said 21st day of April, 1902, and were so marked as seen by said persons as to indicate that they were corner trees and might be corner trees of the land embraced in said patent. That said marked trees had long prior to said 21st day of April, 1902, to wit: six years prior thereto, been cut down and destroyed. That the evidence and testimony which said persons who saw said marked trees could give in relation thereto would be material and important, and of great value to said Stuart in any trial of said action of ejectment to show and prove that said marked trees were the corner in whole, or in part, which was described in said patent as aforesaid as 'three poplars and a sugar tree by a small branch of Knox creek,' and to show and prove that the corner so designated in said patent was located near said Race Fork of Knox Creek, and would be damaging and prejudicial to said King in at-

tempting to show and prove in any such trial that the land embraced in said patent was located as claimed in his said declaration.

"That heretofore, to wit: on the 21st day of April, 1902, in the county of Kanawha, and in the Southern District of the state of West Virginia, and within the jurisdiction of this court, and after the said Stuart in said action of ejectment had, as hereinbefore set out, put in issue the right of the said King to recover therein the lands sought to be recovered by him therein as aforesaid, and while the said matters in controversy in said action of ejectment between the said King and the said Stuart were, as hereinbefore set out, existing and pending, the said V. A. Wilder and the said Daniel Justus for the unlawful, fraudulent and felonious purpose of corruptly obstructing and impeding and with the unlawful, fraudulent, and felonious intent to obstruct and impede the due administration of justice in the said Circuit Court of the United States for the Western District of Virginia in the said action in ejectment then and there pending and undetermined in said court as aforesaid, between the said Henry C. King and the said Henry C. Stuart, and with full knowledge and notice that said action in ejectment was so pending and undetermined, did unlawfully, knowingly, corruptly, fraudulently, and feloniously conspire, combine, confederate, and agree together to prevent, obstruct, impede, hinder, embarrass, and defeat the said Henry C. Stuart, from proving in any trial of said action in ejectment that said marked trees had existed and were located as aforesaid, and from proving in any such trial that the corner in said patent described · as aforesaid was located near said Race Fork of Knox Creek and at the place above described, in this, to wit, that it was then and there unlawfully, knowingly, corruptly, fraudulently, and feloniously conspired, confederated and agreed by and between the said Wilder and the said Justus that the said Justus should endeavor to procure the said Riley Lester, William A. Lester, John H. Lester, Miles Lester, Andrew Baker, George Childers, Jacob Lester, John Charles, Hiram Smith, and Calvin Lester to make false and corrupt statements in writing under oath which should be inconsistent with, and contradictory of, the true facts which they knew in regard to the existence and location as aforesaid of said marked trees, and that said Justus should endeavor to induce and persuade said last-named persons from ever testifying in any trial which might be had of said action in ejection as to the facts within their knowledge which might prove the existence and location as aforesaid of said marked trees, and that the said Justus should endeavor to procure said last-named persons to make false declarations and statements contradictory of, and inconsistent with the facts within the knowledge of said persons which would tend to prove the existence and location as aforesaid of said marked trees, and to which they would testify if examined as witnesses by said Stuart in any trial of said action of ejectment, and that the said Justus should endeavor to make said last-named persons unfriendly and hostile to the interests of the said Stuart which were involved in said action of ejectment and that the said Justus should endeavor to persuade and get said persons to agree not to tell the truth if they were called or examined as witnesses in behalf of said Stuart in any trial of said action of ejectment, and that the said Justus should endeavor to get said persons to conceal and secrete the facts within their knowledge which would tend to prove the existence and location as aforesaid of said marked trees, and that the said Justus should endeavor to get the said persons to make false statements which would indicate that they could give no evidence tending to prove the existence and location as aforesaid of said marked trees, in order that said persons would not be examined as witnesses in behalf of said Stuart in any trial of said action of ejectment and that the said Justus should endeavor to prevent, obstruct, impede, hinder, embarrass, and defeat the said Henry C. Stuart from securing and producing upon any trial of said action of ejectment the evidence which existed in relation to the existence and location as aforesaid of said marked trees through the knowledge of the said parties who had seen the same as aforesaid, or through the knowledge of any other persons who had seen said trees, or any of them, marked and

located as aforesaid, and that the said Justus should refuse to testify in any such trial as to the facts within his knowledge which might prove the existence and location as aforesaid of said marked trees, and that the said Justus should endeavor to find witnesses who, upon any such trial of said action of ejectment, would testify and give evidence against the existence and location as aforesaid of the said marked trees, and evidence to contradict, impair, weaken and destroy the evidence which might be given in any such trial by any of the said persons last named without regard to the fact whether the witnesses so to be found by said Justus would testify honestly and truthfully or falsely and corruptly, and that the said Justus should himself make a false and corrupt affidavit in writing contradictory of, and inconsistent with, the real facts within the knowledge of said Justus as to the existence and location as aforesaid of said marked trees. That thereafter, to wit, on said 21st day of April, 1902, in the said county of Kanawha and at the city of Charleston, and in pursuance of and for the purpose of effecting and carrying into execution the said unlawful, fraudulent, corrupt, and felonious conspiracy, combination, confederacy, and agreement between the said V. A. Wilder and Daniel Justus, and to effect the object thereof, the said Wilder paid to the said Justus the sum of one hundred dollars in lawful money of the United States as a reward and consideration for what the said Justus was to do and perform as aforesaid in pursuance of said combination, confederation, conspiracy, and agreement and the said Justus did, then and there to effect the object of said unlawful, fraudulent, corrupt and felonious conspiracy, combination, confederacy and agreement between him and the said Wilder, make the false and corrupt affidavit which he had agreed to make as aforesaid, and thereafter, to wit, on the 24th day of April, 1902, and on divers other days, in the said county of Buchanan, the said Justus in pursuance of, and for the purpose of carrying out and to effect the object of the said unlawful, fraudulent, corrupt, and felonious conspiracy, combination, confederacy, and agreement between himself and the said Wilder, did unlawfully and corruptly solicit and endeavor to procure certain parties, to wit, the said Riley Lester, William A. Lester, and John H. Lester and divers other parties to the grand jurors aforesaid unknown to make corrupt and false statements contradictory of, and inconsistent with, the real facts, as the said Justus then and there well knew, within the knowledge of said parties last above named and said unknown parties as to the existence and location as aforesaid of said marked trees, and then and there unlawfully and corruptly offer to pay and give, and to procure to be paid and given, money and other things of value to said parties last above named and to said unknown parties in order to obtain such statements, and then and there corruptly and fraudulently solicited the said Riley Lester, William A. Lester, and John H. Lester and said unknown parties to conceal the real facts, as the said Justus then and there well knew, within the knowledge of the said parties last above named and said unknown parties as to the existence and location as aforesaid of said marked trees, and then and there corruptly and fraudulently solicited said parties last above named and said unknown parties to pretend and represent that they knew nothing as to the existence and location as aforesaid of said marked trees, although the said Justus then and there well knew that said last-named parties and said unknown parties had seen some of said marked trees at the location aforesaid and were lawful and competent witnesses to testify in any trial of said action in ejectment to prove the existence and location as aforesaid of said marked trees.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do present, charge and say that the said V. A. Wilder and Daniel Justus, in the said county of Kanawha, in the state of West Virginia, and in the Southern District of said state, heretofore, to wit: on the 21st day of April, 1902, did, in violation of section 5440, Revised Statutes of the United States [U. S. Comp. St. 1901, p. 3676], unlawfully, knowingly, corruptly, fraudulently, and feloniously conspire, combine, confederate, and agree together to commit an offense against the United States, to wit: to corruptly obstruct and impede the

due administration of justice in the said Circuit Court of the United States for the Western District of Virginia, as hereinbefore set out, and to effect the object and to carry out the said unlawful, fraudulent, corrupt, and felonious conspiracy, combination, and confederacy, did the acts and things hereinbefore set out; all of which is contrary to the form, force, and effect of the statute of the United States in such case made and provided, and against the peace and dignity of the United States."

Maynard F. Stiles, for plaintiffs in error.

Geo. W. Atkinson, Dist. Atty., and Malcolm Jackson, Special U. S. Atty., for the United States.

Before GOFF, Circuit Judge, and BOYD and McDOWELL, District Judges.

McDOWELL, District Judge (after stating the facts). The defendants were indicted April 9, 1903, under section 5440 U. S. Rev. St. as amended by act May 17, 1879, c. 8, 21 Stat. 4, 3 U. S. Comp. St. 1901, p. 3676. On the next day the defendant Wilder appeared in open court, moved to quash the indictment, and demurred to the indictment and to each count thereof. The trial court took time to consider the motion and demurrer, and thereupon said defendant was arraigned and pleaded not guilty. At the next term, on September 22, 1903, both defendants appeared, moved for a change of venue, which was denied, and moved to quash the indictment, presumably only for objections such as could be made on demurrer. The argument not being completed, the court adjourned until the next day, and on September 23d the court overruled the motion to quash and the demurrer. And thereupon "the defendants by their attorneys tendered a special plea in writing, to the filing of which the government objected, and the court having seen and inspected said special plea, and having heard fully the arguments of counsel thereon, the court doth sustain said objection, and thereupon refuse to permit said special plea to be filed, to which action of the court the defendants by their attorneys object and except, and tender their bill of exceptions marked 'Defendants' Bill of Exceptions No. 1,' which is accordingly signed, sealed, and made a part of the record herein." No bill of exceptions appears in the record, no suggestion of diminution of record has been made, and it is understood to be a fact that no bill was ever prepared or submitted to the trial judge. A plea in abatement (endorsed: "Tendered and objection by Gov. and objection sustained by the Court and plea rejected. Sept. 23d, 1903. Edwin M. Keatley, Clerk.") is copied as a part of the record. The cause was tried at the April term, 1904, and resulted in a general verdict of guilty against both defendants, and a judgment sentencing them to pay a fine and the costs.

The assignments of error are based on the action of the trial court in overruling the motion to quash and the demurrer and in refusing to allow to be filed the plea in abatement. If the motion to quash the indictment was based on matter not presented by the demurrer, such matter does not appear in the record. The plea in abatement sets up alleged improper influences brought to bear on the grand jury which returned the indictment. Quite aside from the technical rule which

forbids us to consider the matter presented by the plea, because it has not been made a part of the record by bill of exception, is the fact that the plea was tendered after the trial court had ruled on the demurrer to the indictment and at a term following that at which the defendant Wilder (in whose behalf alone the plea on its face appears to have been offered) had pleaded not guilty. If any reason in excuse of this delay existed, it does not appear from the record. In order to obviate this insuperable objection to considering the plea itself, this court must assume, in the absence of any evidence to such effect, that the trial court erred. So far as we can know, the trial court may have rejected the plea on the ground that the facts set up therein were not recently discovered by the defendants, and that therefore the tender of the plea had been unduly delayed. Nothing in the plea alleges excuse for the delay in tendering it. It is with the strictest propriety that appellate courts refuse to presume that error was committed. Not only is the discretion of the trial courts very great in ruling as to the merits of such pleas (Radford v. U. S., 129 Fed. 49, 63 C. C. A. 491; McGregor v. U. S. [C. C. A.] 134 Fed. 187), but there is also a discretion vested in such courts as to allowing such pleas to be filed after the regular time therefor has passed. We cannot possibly say from this record that the trial court abused this latter discretion. And, unless we can properly so decide, we cannot in any event reach a consideration of the merits of the plea. For these reasons, we do not express any opinion whatever as to the matters set up in the plea.

The assignments of error based on the action of the trial court in overruling the demurrer and motions to quash, based on objections such as can be presented by demurrer, alone remain for our consideration. Attention needs to be given only to the first count of the indictment. As the second count differs from the first only in that the second is more generally expressed, the second count is invalid if the first count is. If the first count is valid, we need not concern ourselves as to the second count.

The indictment is founded on section 5440, Rev. St. [U. S. Comp. St. 1901, p. 3676], as amended, and the offense conspired to be committed was (section 5399 [U. S. Comp. St. 1901, p. 3656]) corruptly obstructing or impeding the due administration of justice in a certain action of ejectment pending in the federal Circuit Court for the Western District of Virginia, styled "King v. Stuart." Section 5399 reads, so far as now material, as follows:

"Every person who corruptly  *  *  *  obstructs or impedes, or endeavors to obstruct or impede the due administration of justice therein [a court of the United States] shall be punished," etc.

Subject to the conclusion to be hereinafter reached as to some important questions, this indictment seems to be well drawn under the rulings in U. S. v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698, and Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419.

Section 5440, Rev. St. as amended by Act May 17, 1879, c. 8, 21 Stat. 4 [U. S. Comp. St. 1901, p. 3676], so far as now material, reads:

"If two or more persons conspire * * * to commit any offense against the United States * * * and one or more of such parties do any act to effect the object of the conspiracy, all of the parties shall be liable. * * *"

The contention that a violation of section 5399, consisting of obstructing the administration of justice in a civil litigation, between private citizens in a federal court, is not an offense against the United States, need not be discussed at any length. One of the sovereign powers of the United States is to administer justice in its courts between private citizens. Obstructing such administration is an offense against the United States, in that it prevents or tends to prevent the execution of one of the powers of the government. See U. S. v. Sanche (C. C.) 7 Fed. 715; U. S. v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698; Pettibone v. U. S., 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419. The agreement must be to commit an offense against the United States; but the act done to effect the object of the conspiracy need not, as we think, be itself a crime or an offense against the United States. U. S. v. Sanche (C. C.) 7 Fed. 715; U. S. v. Newton (D. C.) 52 Fed. 275; U. S. v. Donau, 11 Blatchf. 168, Fed Cas. No. 14,983; U. S. v. Cassidy, (D. C.) 67 Fed. 698, 705; U. S. v. Thompson (C. C.) 29 Fed. 86, 89; Curley v. U. S., 130 Fed. 1, 3, 64 C. C. A. 369. However, this point is not of importance in the case at bar. Here the acts alleged to have been done to effect the object of the conspiracy and those alleged to have been agreed to be done are in the same category. If the act agreed to be done would, upon consummation, violate section 5399, the acts done equally violate that statute. If the acts agreed to be done would, if successful, obstruct or impede the due administration of justice, the acts done were certainly endeavors to obstruct or impede. In its final analysis, therefore, the question now for consideration is the true intent shown by the latter clause of section 5399.

If the strictest and narrowest possible meaning were given the word "administration," as used in this statute, the interferences forbidden would be confined to those which obstruct or impede the judge, the jurors, counsel, the marshal, and possibly witnesses. But such obstructions are provided for in the first part of the statute, and in using the different and broader language employed in expressing the latter clause of the statute it seems clear that the intent was to embrace obstructions other than those which were dealt with in the first clause. Perjury, subornation of perjury, and obstructing officers in the service of process are dealt with in sections 5392, 5393, and 5398 [U. S. Comp. St. 1901, pp. 3653–3655]. The first clause of section 5399 sufficiently provides for influencing, intimidating, or impeding witnesses (who have been summoned or otherwise designated as such) and officers of the court while actually in the discharge of their official duties. If those acts which may obstruct or impede the administration of justice, and which are not embraced within the previously used language, are held not to be embraced within the meaning of the latter clause of section 5399, Congress has wholly failed to forbid such acts, and has uselessly and confusingly twice expressed the same intent in different language.

The argument is made that the conspiracy was not to obstruct or impede the due administration of justice, in that prejudice to Stuart can only be predicated on a double contingency: (1) That, if there had been no act done to carry out the object of the conspiracy, Stuart would in due time discover the facts as to the marked trees; and (2) that, after learning these facts, he would agree with the grand jury in the opinion that evidence of such facts is valuable to him. But the words "due administration of justice" import a free and fair opportunity to every litigant in a pending cause in a federal court to learn what he may learn (if not impeded or obstructed) concerning material facts and to exercise his option as to introducing testimony of such faces. The violation of the law may consist in preventing a litigant from learning facts which he might otherwise learn, and in thus preventing him from deciding for himself whether or not to make use of such facts. The latter clause of section 5399 seems to us to be too broad in its scope to be confined to cases where the suppression of knowledge of material facts merely might not prejudice the litigant. On the other hand, it is, as we think, sufficient if the litigant might be prejudiced by the success of the conspiracy. The acts intended to be made criminal by the latter clause of the section are, as we think, not forbidden merely on the ground that such acts will of necessity prevent a fair trial, but on the ground that such acts may prevent such trial. We need give no weight to the conclusions of the grand jury that the facts sought to be suppressed are "material" in the ejectment cause, and that to prove them would be "valuable to Stuart." The facts alleged in the indictment are such that this court must for itself of necessity draw the conclusion that the facts as to the marked trees are material. Whether or not it will be of value to Stuart to prove these facts when the ejectment cause comes on to be tried is now a mere matter of opinion. And even after a trial of the ejectment cause shall have taken place, if Stuart should introduce the evidence sought by the defendants here to be suppressed, it is conceivable that it would still be a matter of opinion as to whether or not such course was a wise one. When a conspiracy, such as the one here, is discovered and the indictment is returned in advance of the trial of the case of the litigant against whose interest knowledge of material facts has been attempted to be suppressed, it must, at the date of the indictment, be a mere matter of opinion whether or not the litigant will seek to use the facts, and equally a mere matter of opinion whether or not he would, if there had been no interference, have discovered the facts; but, if the conspiracy be successful, it is manifest that the litigant cannot have favorable occasion for preparing for trial. This imports a fair opportunity to learn what may be of value concerning material facts and a consequent fair opportunity to decide intelligently whether or not to use such facts when the case comes on to be tried.

In the brief of the learned counsel for defendants it is said:

"I apprehend that one party to a lawsuit would have a legal right to make it as difficult as possible for his opponent to prove his case, and consequently to 'conspire' with some one else to do so. Of course, he would

have no right to commit or procure perjury, or prevent execution of, or obedience to, process, nor tamper with a 'witness'; but none of these things is charged in this indictment."

If section 5399 did not contain the language used in its last clause, this argument might be sound. But this argument shows the vital need for a federal statute such as we deem the clause mentioned to be. In the absence of a federal statute of the scope of this clause, a party to a pending civil suit in a federal court, so long as process for persons intended to be used as witnesses by his adversary had not been issued, could legally induce all such persons to conceal themselves or otherwise evade service of process. But that such acts, if successful, would impede and obstruct the administration of justice, is quite apparent.

It is further contended as follows: The indictment does not allege that the marked trees were in fact corner trees of the Morris tract. They may not have been, and, if not, the "conspiracy" was merely an agreement to prevent a perversion of justice. This argument assumes a right in the defendants here to decide a question which under our theory of law should be left, at Stuart's option, to the decision of the tribunal which is to try the ejectment cause. As we cannot here and now assume the truth of the hypothesis on which this argument is founded, it follows that the sufficiency of the indictment must be determined on the only permissible hypothesis, to wit, that the trees in question may have been corner trees of the Morris tract. The facts as to these trees (that there were some poplar trees, not over three in number, and one sugar tree standing near together, standing near a branch of Knox creek, so marked as to indicate that they were corner trees and might be corner trees of the Morris tract) are sufficient, read in connection with the other facts alleged in the indictment, especially the quotation from the grant, "three poplars and a sugar tree by a small branch of Knox creek," to make it necessary for the court to draw the conclusion that these trees may have been corner trees of the Morris tract. The possibility that these trees may not have been corner trees of the Morris tract does not affect the validity of the indictment, and does not prevent the charge of suppressing the information concerning these trees from being a sufficient charge of an impeding or obstructing the due administration of justice. The fallacy underlying the argument now under discussion is the same as that discussed above. It was wholly unnecessary for the pleader to allege in the indictment that the trees were in truth corner trees, and under the present indictment evidence tending to show that the defendants believed they were not corner trees of the Morris tract would not have been admissible in behalf of the defendants. After verdict of guilty such evidence might well be offered to the trial judge in mitigation of punishment. It might reduce the culpability of the defendants, if they believed and had reason to believe at the time of the agreement that these trees were not corner trees; but such belief would not prevent the agreement from being a conspiracy to violate section 5399, Rev. St. A belief on the part of the defendants that the trees in question were

not in truth corner trees of the Morris tract, and that the "testimony" sought to be suppressed was false, would lessen the moral wrong involved, but would not excuse the commission of the acts alleged in the indictment. Such argument is not even based on the ancient fallacy that a good end justifies the use of improper means. It is based on the assumption that a supposed good end justifies the use of improper means. As hereinbefore stated, the allegations of the indictment are such that we cannot assume that the trees were in fact not corner trees of the Morris tract. The utmost length that we can go in this case in making assumptions favorable to the defendants is that they believed that the trees were not in fact corner trees. Hence the argument above referred to is based on the theory that forbidden and illegal means may properly and legally be used if the ultimately intended result is morally justifiable. It could be equally well argued that intimidating a witness is not a violation of the first clause of section 5399, if the person so doing believes that such witness will testify falsely.

As we have under consideration only the questions raised by demurrer to the indictment, we do not express any opinion as to the admissibility or effect, on trial, of evidence proving or tending to prove that the trees here in question were not in fact corner trees of the Morris tract.

We are of opinion to affirm the judgment of the trial court.

Affirmed.

BOYD, District Judge (dissenting). I am unable to concur in the opinion of the court in this case, and for the following reasons:

The plaintiffs in error, who will hereafter, for convenience, be designated as the "defendants," demurred generally to the indictment, and to each count thereof. The demurrer was overruled by the court, to which the defendants duly excepted.

The question which I will first discuss is whether the indictment, or either count thereof, contains allegations sufficient to charge an offense against the criminal laws of the United States. The indictment is drafted under section 5440 of the Revised Statutes [U. S. Comp. St. 1901, p. 3676], which is in the following language:

"Sec. 5440. If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable to a penalty of not more than ten thousand dollars or to imprisonment for not more than two years, or to both fine and imprisonment, in the discretion of the court."

The Supreme Court, in United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698, has construed this statute, and, as I interpret the opinion, has held that, in order to constitute a crime under its provisions, the persons charged must conspire to commit a criminal offense against the laws of the United States, and some one or more of the conspirators must do an act in furtherance of the conspiracy, and that the act done must itself be a crime against the United

States; that is, the act to carry into effect the conspiracy, standing alone, must be a violation of a criminal statute of the United States. In this respect the offense created by section 5440 differs from conspiracy at common law; the latter offense being complete when the agreement is made, or the combination entered into to do the unlawful act.

My first consideration will, therefore, be directed to an analysis of the indictment, and to ascertain if there is enough in it to fulfill these requirements. The offense which it is alleged Wilder and Justus conspired to commit is by virtue of section 5399 of the Revised Statutes [U. S. Comp. St. 1901, p. 3656], which is as follows:

"Sec. 5399. Every person who corruptly, or by threats or force, endeavors to influence, intimidate, or impede any witness or officer in any court of the United States, in the discharge of his duty, or corruptly, or by threats or force, obstructs or impedes, or endeavors to obstruct or impede, the due administration of justice therein, shall be punished by a fine of not more than five hundred dollars, or by imprisonment not more than three months, or both."

The charge against the defendants, in substance, is that they conspired to corruptly obstruct and impede the due administration of justice in the trial of a certain civil action in which Henry C. King is plaintiff, and Henry C. Stuart defendant, pending in a court of the United States, to wit, in the Circuit Court of the United States for the Western District of Virginia. To corruptly obstruct or to impede the due administration of justice in a court of the United States is a violation of section 5399, above quoted; but a mere conspiracy to violate this section does not constitute the offense under section 5440. Some act must be done, as before stated, by one or more of the parties to the conspiracy, to carry the same into effect, and that act, as is decided in United States v. Britton, supra, must be a crime in itself. This brings me to the important point in the present case; and that is, are the acts, or any of the acts alleged to have been done by the defendants in furtherance of the conspiracy, in themselves a violation of the criminal statutes of the United States? There are no crimes against the United States except such as are so made by the statutes enacted by Congress, and, unless the defendants violated one or more of these statutes, in what they or one of them, did to carry out the conspiracy, the offense under section 5440 is incomplete.

In order to fully present the question, it will be necessary to restate, in substance, the material facts as set out in the indictment. It is alleged that the Morris patent of June 23, 1795, locates a corner of the land granted at "three poplars and a sugar tree, by a small branch of Knox creek"; that it is material and important for Stuart, in his defense to King's action, to prove that this corner was located near Race Fork, a small branch of Knox Creek; that as an evidence of this fact there had stood at this point three poplars and a sugar tree, marked to indicate a corner, which had been destroyed six or seven years before; and that Riley Lester, William Lester, and the others named in the indictment, as well as the defendant Justus, had knowledge of the fact that these three poplars and a sugar tree on Race Fork were so marked before their destruction. The indict--

ment alleges that it was of great value to Stuart, and to his interest to prove that these three poplars and a sugar tree, near Race Fork, a small branch of Knox Creek, had existed, marked to indicate a corner, which had been destroyed some six or seven years before. Such evidence, it is alleged, would be damaging to King in the trial, because it would give him less land in the event of the establishment of the corner at that point. In the indictment the gravamen is that Wilder, who was the agent of King and represented his interests in connection with his lands in Virginia and West Virginia, and Justus, agreed to obstruct and impede the due administration of justice by using the methods recited to prevent Stuart from proving, in a trial of the case, that the corner referred to was at the point above stated. It is a criminal offense, under section 5399, as before stated, to corruptly or by force or threats impede or obstruct the due administration of justice in a court of the United States, but it is not an offense, under section 5440, to conspire to corruptly or by force or threats impede or obstruct the due administration of justice in a court of the United States, unless the conspirators, as is held in U. S. v. Britton, supra, commit a crime in their efforts to carry out the purposes of the conspiracy. This presents the question directly: If Wilder and Justus did the acts jointly or severally charged against them, in furtherance of the alleged conspiracy, did they thereby violate any criminal law of the United States? It is alleged that Justus knew of the existence of the marked trees which had been destroyed on Race Fork, a small branch of Knox Creek, the corner claimed by Stuart, and also that he knew that the Lesters and others named in the indictment had knowledge of it; that, in this situation, Justus himself made an ex parte affidavit that he had no knowledge of the existence of such corner; that he solicited and endeavored to procure the Lesters and other persons named in the indictment to make corrupt and false statements, contradictory of, and inconsistent with, the real facts relative to the existence and the location of said marked trees; that he offered to pay and give money and other things of value to said parties, in order to obtain such statements; and that he endeavored to persuade the said parties to conceal the real facts as to the location and the existence of said marked trees, and tried to induce them to pretend and represent that they knew nothing as to the existence and location of the same. I have found no law of the United States under which any of these acts alleged to have been done in furtherance of the conspiracy, entered into between Wilder and Justus are in themselves made criminal. One of the acts alleged is that Justus, in furtherance of the conspiracy, made an affidavit denying the facts within his knowledge, which would be competent and material evidence in the said action of ejectment as to the true location of the boundaries of the land embraced in the Morris patent; but this allegation does not contain facts sufficient to charge a criminal offense on the part of Justus in making the affidavit, for it does not amount to a charge of perjury. It is not alleged that he made the affidavit in any case in which a law of the United States authorizes an oath to be administered, or that the oath was

taken before a competent tribunal, officer, or person, under the provisions of section 5392 of the Revised Statutes, which is the only statute covering the crime of perjury committed in the making of an ex parte affidavit as to persons generally, though there are other statutes which apply to officers and persons making false affidavits in particular cases. The affidavit made by Justus could not be used as evidence on the trial of the case of King against Stuart, and, so far as I can see, the only effect of it was to have from Justus a statement, which the indictment alleges was under oath, as to his knowledge of a certain boundary which was in controversy in the case. The other acts alleged to have been committed by Justus in furtherance of the conspiracy are of the same character. None of them violate any criminal statute of the United States. It is alleged that he undertook to persuade certain persons named in the indictment to make false statements as to their knowledge of the facts about the boundaries of the land in controversy; but it is not alleged that he succeeded in procuring any false statement. It is further alleged that he undertook to induce such statements by the payment of money, but there is no allegation that anybody accepted the money, or made a false statement; and, even if they had, it is not alleged that any false statement was made by a witness who had been subpœnaed by Stuart, or by any person that Stuart knew would be material to him as a witness in his case. It is true that if Justus, having entered into a conspiracy with another or others to impede and obstruct the due administration of justice in the trial of this case of King v. Stuart, had himself gone upon the stand as a witness, and sworn falsely, thus committing perjury, this would have completed the offense under section 5440, and all of the conspirators would be guilty, or if Justus, in furtherance of the alleged conspiracy, had, by bribery or otherwise, procured a witness to commit perjury, and thus have been guilty himself of subornation of perjury, in that event the conspirators would be guilty of the offense under section 5440. But no such acts were committed in this case. The acts alleged to have been committed in furtherance of the conspiracy fall short of that which is necessary to complete the offense contemplated by the section. If A., B., and C., conspire together to break into and rob a post office, which is a criminal offense against the United States, and A., in furtherance of the conspiracy, procures the necessary implements, goes to the post office, and breaks the window so as to permit an entrance, then, all of the conspirators would be guilty of a crime under section 5440, although the post office was not actually robbed, because the act which A. does in furtherance of the conspiracy is itself a violation of the criminal laws of the United States; that is, to break into a post office. But if A. simply procures the implements, although with intent to break open the office, and does nothing further then the offense, under section 5440, is not complete. So it would be in a conspiracy to defraud the United States through a false pension claim. If a number of persons conspire together to commit a fraud of this sort upon the government, and to accomplish the purpose through false affidavits and one

of them prepares statements intended to be sworn to, and yet desists before the statements are sworn to and filed, no offense is committed under the provisions of section 5440, because the mere making or procuring of written statements, not under oath, and which are not filed, is no violation of the criminal laws of the United States. These two examples fully illustrate the position I take upon this indictment, and I think they are in entire harmony with the decision of the Supreme Court in Britton's Case. I am consequently led to the conclusion that, no matter how great the impropriety of the alleged acts on the part of Wilder and Justus, they are not sufficient to constitute a criminal offense under the provisions of section 5440.

I have so far discussed the question involved upon the assumption that the indictment charges specifically that the corner alleged to be indicated by the three poplars and the sugar tree on Race Fork was, in fact, a true corner in the boundary lines of the lands in controversy; but upon a careful reading of the indictment it will be found that it alleges no such thing. The allegation is that it is important and material for Stuart, in order to show that King is entitled to a much less quantity of land than he is claiming, to prove that the corner is at that place; and in the first count of the indictment it is alleged that the Lesters and other persons named in the indictment, together with the defendant, Daniel Justus, had, seven years prior to the 21st of April, 1902, "seen certain marked poplar trees, not over three in number, and a marked sugar tree, standing near together, and near said Race Fork of Knox Creek, in said Buchanan County, and within a short distance, to wit, four hundred feet of the house where the said Daniel Justus resided on the 21st of April 1902, and were so marked as seen by said persons as to indicate that they were corner trees, and might be corner trees of the land embraced in the said patent." And this is the fact which it is alleged that it was important and material for Stuart to prove. The question arises at once, therefore, as to whether or not it would be the due administration of justice for Stuart to prove that fact, because after all the point indicated by the three poplars and the sugar tree, as alleged, might not be a true corner of the lands involved. Indeed the very allegation in the indictment leaves that matter in doubt, because it says the trees, as seen by said persons "were so marked as to indicate that they were corner trees, and might be corner trees of the land embraced in the said patent." It is a consistent deduction that, if these trees so marked only indicated that they were a corner or might be a corner, the converse of the proposition, that the indication might prove incorrect, or that these trees might not be a corner of this boundary, is equally plausible. If they were not a corner, then it could be no obstruction to the due administration of justice to show and prove that fact. But, aside from this, the sole proposition in the present case centers in the location of the corner said to be indicated by the three poplars and the sugar tree which had been destroyed on Race Fork, a small branch of Knox Creek. In order to make the indictment sufficient in that respect, it should have been alleged, definitely and specifically, that that was a true corner, and that

the testimony of the parties named, if examined as witnesses in the case would prove it. Alternative allegations in an indictment are not permissible, and indefinite allegations are equally as objectionable. An allegation in an indictment as to the principal fact upon which the indictment is based cannot be sustained where it is charged in the alternative or in terms which are uncertain. For this reason, I am of the opinion that the first count in the indictment, at least, cannot be upheld, even if it contained other sufficient allegations to make it good in law.

Having discussed the indictment in its legal aspects, and arrived at the conclusion that it is insufficient in law to charge a criminal offense, I feel constrained to go further and express my views upon the character and purposes of the prosecution as I gather them from facts appearing in the record. In the progress of the case in the court below the defendants filed a plea in abatement, and also an affidavit for change of venue. I copy from the plea in abatement, which was sworn to, and the statements in which, so far as appears of record, were not contradicted, the following averments:

"At the time of making of said indictment, and for a long time prior thereto, there was and had been pending in circuit court of West Virginia, for the county of Cabell, a certain chancery suit entitled 'State of West Virginia v. Henry C. King et al.,' in which the defendant was interested personally and as agent of said King, and in which C. W. Campbell, who is one of the complaining witnesses upon said indictment, was a party, and together with John A. Sheppard, who is another of the complaining witnesses upon said indictment, was counsel in said chancery cause for himself and a large number of other parties who claimed in said suit sundry portions of the 500,000-acre tract of land mentioned in said indictment adversely to said King, and in the trial of said cause before a commissioner in said chancery cause sought and attempted to establish a corner of said tract upon Race Fork of Knox Creek, in Buchanan county, Virginia, at a point where they contended that the three poplars and a sugar tree, called for as a corner of said 500,000-acre tract, once stood; but the said commissioner found and reported against said contention and against said pretended corner, and against the location of said tract contended for by said Campbell and Sheppard and their clients and associates. Thereupon the said Campbell and Sheppard, conspiring and contriving together, and with sundry of their clients and associates, as this defendant, upon information and belief, charges, on their own motion, initiative, and accord, gathered up Riley Lester and John H. Lester, who had been witnesses for said Campbell and his clients in said chancery cause in said state court, and not elsewhere, and presented themselves unsolicited by any officer or agent of the United States before the grand jury then sitting in this cause at its April, 1902, term, and insisted upon testifying before said grand jury, and did testify before said grand jury, as this defendant is informed and believes. At the same time, and as a part of the same plan and arrangement, came one Malcolm Jackson, Esq., an attorney not in the employ of nor in any manner connected with the government of the United States, but representing the private persons interested and claiming adversely to said King in said chancery suit in said state court, with the aforesaid indictment herein prepared in advance, as this defendant is informed and believes, and, without reference to any evidence that might be given and produced before said grand jury then and there sitting, and together with said Campbell and Sheppard, procured said paper to be received and returned as the indictment in this case, and to be indorsed by the district attorney, and this defendant, upon credible information and belief, says that the said indictment was not drawn or prepared by or under the direction of any attorney, officer, or agent of the

United States, nor at the procurement or request of any such attorney, officer, or agent, but that the same was drawn, devised, contrived, and procured, and the evidence therefor, if any there was, tending to justify it, procured and furnished solely by private and voluntary prosecutors."

And in the affidavit for change of venue, among other facts, it is stated in substance that within the boundaries of the Morris grant, under which King claims, is included some 500,000 acres of land; that, since King began to assert his title to this land, various suits and actions affecting it have been instituted, and many are still pending, both in the federal and in the state courts, in the states of Virginia and West Virginia; that many of the claimants adverse to King in the causes affecting said lands are residents of Cabell county, in the town of Huntington, W. Va., in which the present case was tried, and many of the others are closely related and connected with the residents of the said town and county, and adjoining counties, by blood and marriage, and through business, political and social relations; that the principal attorneys representing interests adverse to King, including C. W. Campbell and his law partner, reside at Huntington, and have extensive acquaintance and many friends, adherents, and partisans, and great influence and prestige in the said town, and throughout the said county and the surrounding counties. It is further set forth that in the suit in the name of the State of West Virginia v. King and others, pending in the circuit court of Cabell county, there has been an investigation before a commissioner in chancery relative to the alleged corner on Race Fork of Knox Creek, which is referred to in the indictment, and that the commissioner, after taking testimony, found and reported that certain stumps claimed to be those of the three poplars and sugar tree said to have been destroyed were not stumps of any corner trees, or marked trees, and that there was no corner of the Morris tract at that place, and, continuing, I find the following statement in the affidavit for change of venue:

"That much bitterness of feeling arose out of the said case, and in revenge and in an effort for personal vindication and in the hope that some 'moral effect' upon the final action upon said commissioner's report might be had, as affiant believes and charges, the said Campbell and Sheppard, upon their own motion, went before the grand jury and procured the said indictment to be made; and they and their clients in said suit of State of West Virginia v. King et al., procured other counsel to appear and to assist them and to draw and prepare the said indictment, and this affiant is informed by the district attorney that the said Campbell, and Sheppard, and other counsel employed by private persons, will have, if permitted by the court, the practical and active conduct and prosecution of this cause. That the cause is not instituted and prosecuted at the instance and in the interest of the government of the United States, but by private persons for private purposes and as an auxiliary to the land litigation between said King and those interested with him on one side, and the persons claiming said land adversely to him and their counsel on the other."

It is true that the court below declined to consider the plea in abatement, and denied the motion for change of venue, but, notwithstanding this action of the court, the statements in the plea and in the affidavit filed for change of venue are in the record, and, as before stated, there is nothing to show that they were controverted. These

143 F.—29

statements tend to show, at least, that the interest of private parties prompted the institution of this case, and, taken together with the allegations in the indictment, there plainly appears in the whole proceedings the earmarks of a criminal prosecution inaugurated and conducted for the attainment of private and personal ends, rather than the due administration of public justice. In my opinion a case of this importance, and one so materially affecting the rights and interests of citizens, should not be sent to the grand jury without previous investigation by the officers or agents of the government appointed for the purpose, and not until, upon such investigation, it is made satisfactorily to appear that the ends of justice are to be subserved by the prosecution. It is not denied that Sheppard and Campbell, two lawyers, both of whom are indorsed upon the indictment and were examined as witnesses before the grand jury, were interested adversely to King in the land litigation, both as attorneys and as claimants of the land which King is seeking to recover under his patent. The prosecution was not initiated by any officer or agent of the United States, nor, so far as appears, even suggested by such officer or agent. On the other hand, it is admitted that the indictment was prepared outside of the office of the United States attorney for the district; was drafted by an attorney retained and employed by private parties; was carried before the grand jury by attorneys who appear against King in the land litigation, and who themselves, as above stated, are named as witnesses on the indictment, and were sworn and examined as such witnesses. It is not the policy of the United States to accept the voluntary services of attorneys in the prosecution for violation of its criminal laws. The Congress of the United States has wisely provided a department of justice, at the head of which is the Attorney General, and associated with him the Solicitor General, and a corps of assistants. This department has, in general, the control and direction of prosecutions for the violations of the criminal laws of the government, and, in addition, in each judicial district the law provides for an attorney of the United States, whose official duty it is to prosecute in behalf of the government. Besides this, in every department there are agents, examiners, and other instrumentalities provided, through which alleged offenses against the government are investigated, and parties charged with crime brought to trial. It is true that in many of the states what are known as "private criminal prosecutions" are permissible, but in such cases the usual proceeding is to indorse the name of the private prosecutor on the indictment before it goes to the grand jury, and in the end, if the charge is ascertained by the court to be unfounded, frivolous, or malicious, the indorsed prosecutor is made to pay the costs. But there is no such provision governing proceedings in criminal causes in the courts of the United States. In these courts private prosecutors are unknown. I lay it down as a proposition based upon the highest principles of justice that it is dangerous to open the way for the use of the grand jury as an instrument for the furtherance of interests involved in civil controversies between private parties. In a charge to the grand jury, delivered by the late Justice Field in 1872, he said:

"The grand jury is designed as a means of not only bringing to trial persons accused of public offenses upon just grounds, but also as a means of protecting citizens against unfounded accusation, whether it come from government, or be prompted by partisan passion or private enmity."

See 2 Sawy. 699, Fed. Cas. No. 18,255.

The circumstances which surrounded the institution of this prosecution, the fact that some of the persons who were active agents in the procurement of the indictment were interested, both as attorneys and claimants, in the land litigation with King, that private counsel was employed to prepare the indictment and prosecute the case in court, and other incidents connected with the proceeding—must necessarily impress the unprejudiced mind with the belief that the prosecution is intended as an auxiliary to the land litigation arising under the Morris patent, and in aid of those claiming adversely to King. Is a party to a civil action pending in court, which is only at issue upon the pleadings and not set for trial, with no testimony taken or witnesses subpœnaed in his behalf, to arrogate to himself the assumption that justice abides alone in him, and with his contention, and that concerted action on the part of his adversaries to disprove his claim is a crime? If such be the law, then in nearly every case of importance in the courts, the parties on the one side or the other, and perhaps on both, would be liable to indictment.

The exceptions to the action of the court below upon the plea in abatement and on the motion for change of venue are not presented in the record in such way as to authorize a review of the same by this court, and I have only adverted to these matters in order to discuss the propriety of criminal prosecutions instituted under the conditions appearing in this case, and to again reiterate that it is dangerous to both the personal and property rights of the citizen to permit the use of the grand jury in aid of civil litigation.