**MICHAELSON et al. v. UNITED STATES ex rel. CHICAGO, ST. P., M. & O. RY. CO.**

(Circuit Court of Appeals, Seventh Circuit. July 11, 1923. Petition for Rehearing Overruled. September 21, 1923.)

No. 3221.

1. **Injunction** ☞231—**On writ of error, only question is whether prima facie case of violation made by evidence.**

On writ of error to review judgments for criminal contempt, challenge of sufficiency of evidence goes only to question whether prima facie case of violation of injunction was made.

2. **Jury.** ☞13(21)—**Strikers not entitled to benefit of provision for trial by jury, unless they continued to be employees.**

Under Clayton Act, §§ 20–22 (Comp. St. 1243d, 1245a, 1245b), strikers, in order to have benefit of provision for jury trial for contempt in violating injunction, must have been employees until after the alleged violations.

3. **Jury** ☞13(21)—**Statute intended to give absolute right to trial by jury.**

Though Clayton Act, § 22 (Comp. St. § 1245b), provides that trial for contempt in violating injunction "may," on demand of accused, be by jury, it was intended to give absolute right to such trial to the special class in the special cases to which it applies.

4. **Jury** ☞13(21)—**Strike does not in itself terminate relation, so as to deprive strikers of benefit of statute as to jury trial.**

In case of controversy over wages and conditions of work in private and local industry, a strike does not of itself terminate relation of employer and employee, so as to defeat right to jury trial for violation of injunction, under Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b).

5. **Jury** ☞13(21)—**Striking employees of interstate railroad do not remain employees, and are not entitled to trial by jury for violation of injunction.**

In view of control by Interstate Commerce Commission over service and rates of interstate railroads and their lack of right to abandon operations, under Comp. St. §§ 8563–8583, a strike by employees is not a lawful strike, and the strikers do not remain employees, and are not entitled to benefit of Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b), providing for trial by jury for violation of injunction.

6. **Jury** ☞13(21)—**Strikers, rejecting decision of Labor Board, held not employees, so as to be entitled to trial by jury.**

Where railroad company accepted decision of Railroad Labor Board fixing wages of employees under Transportation Act 1920, tit. 3, but employees rejected the decision and went on strike, the strike was a controversy with, or strike against, the Labor Board as instrumentality of the government, and terminated employment, so that strikers were not employees, entitled to benefit of Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b), providing for trial by jury for violation of injunction.

7. **Jury** ☞13(21)—**Statute authorizing trial by jury for violations of injunction held unconstitutional.**

Clayton Act, §§ 20–22 (Comp. St. §§ 1243d, 1245a, 1245b), providing for trial by jury for violation of injunction in disputes concerning terms or conditions of employment, is unconstitutional, under Const. art. 3, §§ 1, 2, as courts, when created, receive their judicial power from the Constitution, and Congress cannot deprive parties in equity of right of trial by chancellor; enforcement of decree by contempt proceeding being an inherent power of an equity court.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Western District of Wisconsin.

Contempt proceeding by the United States, on the relation of the Chicago, St. Paul, Minneapolis & Omaha Railway Company, against Sam Michaelson and others. Judgments against defendants, and they bring error. Affirmed.

John A. Cadigan and Peter B. Cadigan, both of Superior, Wis., for plaintiffs in error.

John S. Sprowls, of Superior, Wis., and Richard L. Kennedy, of St. Paul, Minn., for defendant in error.

Before BAKER, EVANS, and PAGE, Circuit Judges.

BAKER, Circuit Judge. This writ of error brings up for review judgments against plaintiffs in error for criminal contempt.

On July 1, 1922, these men went out on the so-called strike of the shop crafts unions. Shortly thereafter the trial court, on the bill and motion of the railroad company, relator herein, entered a temporary restraining order which was found in this proceeding to have been violated.

[1] I. As the case is here on writ of error, the challenge of the sufficiency of the evidence goes only to the question whether a prima facie case of violation was made. Bessette v. W. B. Conkey Co., 194 U. S. 324, 24 Sup. Ct. 665, 48 L. Ed. 997. We have examined the evidence, and find an abundant showing against plaintiffs in error to support the finding of intimidation of shop workmen and of picketing by groups in a manner condemned in recent cases. American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189; Truax v. Corrigan, 257 U. S. 312, 42 Sup. Ct. 124, 66 L. Ed. 254.

II. After this contempt case had been brought here, the railroad company dismissed its bill for injunction. This did not have the effect of canceling these judgments, which had already been entered.

III. Did the court err in overruling the demand of plaintiffs in error for a jury trial?

Section 20 of the Clayton Act (Comp. St. § 1243d) speaks of the respective rights of "employers and employees" in any injunction case "involving or growing out of a dispute concerning terms or conditions of employment."

Under section 21 (Comp. St. § 1245a), if an injunctive order is violated by the doing of an act which would be "also a criminal offense under any statute of the United States or under the laws of any state in which the act was committed," the offender shall be proceeded against for contempt as provided in section 22 (Comp. St. § 1245b), namely:

"Such trial may be by the court, or upon demand of the accused, by a jury; in which latter event the court may impanel a jury from the jurors then in attendance, or the court or the judge thereof in chambers may cause a sufficient number of jurors to be selected and summoned, as provided by law, to attend at the time and place of trial, at which time a jury shall be selected and impaneled as upon a trial for misdemeanor; and such trial shall conform, as near as may be, to the practice in criminal cases prosecuted by indictment or upon information."

[2] Counsel seem to be agreed, and we think properly so, that plaintiffs in error, in order to have the benefit of the Clayton Act, must have been "employees," within the meaning of the act, from the time of the so-called strike down till after the violations.

They also do not question that the violations would constitute criminal offenses under statutes of the United States and of Wisconsin.

[3] But they do not agree upon the construction of section 22. Counsel for defendant in error point to the permissive word "may" in the phrases "the trial may be by a jury" and "the court may impanel a jury." For plaintiffs in error it is argued that the permissive word "may" is to be construed as mandatory, wherever that course is necessary in order to preserve the clear meaning of other words and phrases in the context (36 Cyc. p. 1160), and that the word "demand" (to claim as a matter of right) and the phrases "a jury shall be impaneled" and "such trial shall conform to the practice in criminal cases" require that permission be taken as duty. Obviously there is an ambiguity, an inconsistency, an opposition of words. We think the ambiguity can be cleared by a reference to the history of the times preceding the Clayton Act and a consideration of the asserted evil to be cured by the proposed legislation. For many years political and social writers and speakers had been denouncing the interference of judges in the combats between labor and capital and had been insisting that the question of unlawful conduct in such combats should not be decided except by jury trial. A political party gave a pledge to abolish "government by injunction," meaning by that quoted phrase the chancellor's use of punitive and coercive means to enforce the chancellor's decree which, after full hearing and subject to the right of appeal for the correction of errors, adjudged that proven trespasses upon property should cease. And the bill, introduced by Representative Clayton, was drafted by the labor unions. As drafted the bill did not contain the ambiguity we now find. In the course of the bill's progress to enactment a word was inserted which may be given a permissive or a mandatory sense. Rather than attribute to Congress an intent to issue a "brutum fulmen," it should be agreed that the intent was to give to the special class in special cases the absolute right to trial by jury.

Nevertheless plaintiffs in error were not entitled to a trial by jury.

[4] (1) If their going out on the so-called shop crafts strike ended the relation of employer and employee between them and the railroad company, they would not be within the special class selected by the Clayton Act.

In the case of a controversy over wages and conditions of work in a private and local industry, we agree with counsel for plaintiffs in error that a "strike" does not of itself terminate the relation of employer and employee. A controversy arises, and the employees, then at work, say to their employer:

"We shall stop work until you are in what we may consider a more reasonable state of mind. We shall deprive you of our labor as a legitimate means of exerting economic pressure to induce you to yield. If we do go out, we shall remain at hand, ready to negotiate with you concerning fair wages and working rules, and ready to return to work the moment we can agree."

If, by reason of a failure to agree, the employees stop their work, a "strike" is on. They are no longer working and receiving wages; but, in the absence of any action other than above indicated looking to a termination of the relationship, they are entitled to rank as "employees," with the adjective "striking" defining their immediate status. And a "lockout" by the employer is the exact counterpart of the "strike" by the employees. In the industrial combat the two sides must have equal and reciprocal rights in exerting economic pressure. 5 Illinois Law Review, 453; 31 Yale Journal, 321; Iron Moulders' Union v. Allis-Chalmers Co., 166 Fed. 45, 91 C. C. A. 631, 20 L. R. A. (N. S.) 315; Gasaway v. Borderland Coal Corporation (C. C. A.) 278 Fed. 56; Uden v. Schaeffer, 110 Wash. 391, 188 Pac. 395, 11 A. L. R. 1001.

Among the cases in the Supreme Court dealing with the respective rights of capital and labor in economic controversies, those arising in private and local industries predominate. Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815; Paine Lumber Co. v. Neal, 244 U. S. 459, 37 Sup. Ct. 718, 61 L. Ed. 1256; Hitchman Coke & Coal Co. v. Mitchell, 245 U. S. 229, 38 Sup. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Duplex Co. v. Deering, 254 U. S. 443, 41 Sup. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 Sup. Ct. 72, 66 L. Ed. 189; Truax v. Corrigan, 257 U. S. 312, 42 Sup. Ct. 124, 66 L. Ed. 254. In the American Foundries Case, the strike involved a steel plant in Granite City, Ill. In the Truax Case, the center of the industrial storm was a restaurant on "Main street" in Bisbee, Ariz. In no case of which we have cognizance has the point been made that the rules for economic combats in private and local industries, which society tolerates, have no just application to our present-day system of railroad transportation. When common carriers were few and small and relatively local, when the interference with the noncombatants was no greater than in a private industry, and when the common carrier was unfettered as a combatant, there could be no greater objection to a strike against a common carrier than to one against a restaurant. In all such cases the noncombatants will have to wait until advancing civilization shall have put the strike in limbo with the duel. At the time of the Pullman strike (In re Debs, 158 U. S. 564, 15 Sup. Ct. 900, 39 L. Ed. 1092), though the disturbance in and about Chicago was very considerable, the railroad unions did not have their hands at the throat of the nation, and the railroads as combatants had not become completely fettered. To-day the concerted action of railroad unions in stopping transportation might destroy our industries and imperil the lives of our people. But it is not upon a consideration of public distress or public necessity that we base a legal distinction exempting interstate railroads from the "strikes" that are permissible in private industry. To be a legal distinction (and not a mere suggestion of further congressional action) it must be based on the interpretation and application of the law as it stands today.

[5] (a) Interstate railroads are under control of the Interstate Commerce Commission with respect to the nature, quality, and amount of service to be given to passengers, to shippers, and to other carriers. Comp. St. 1918, §§ 8563–8583; Comp. St. Supp. 1923, § 8563,

subds. 10–21. This service is the only commodity that the railroads have, from the sale of which they can derive an income. A private employer, free to fight, and engaged in one of these so-called "industrial combats," might consider it wise to sign a treaty of peace giving his employees higher wages, because legally he could cheapen his commodity to the same degree and thereby keep his business alive. Interstate railroads have no such control of their commodity.

(b) Or the private employer, being legally free to do so, might think it best to make up his increased cost of production by increasing the price of his commodity. Interstate railroads have no such control of their prices. The Interstate Commerce Commission on its own initiative has power to classify and regulate the business, and to fix maximum or minimum, or maximum and minimum, or the particular rates, fares or charges for all the business. Comp. St. Supp. 1923, § 8583 (1).

(c) Or the private employer, being legally free to do so, might conclude to shut up shop, wind up his business, and quit. Interstate railroads have no legal right to quit. Most of them have state charters for fragmentary parts of their systems. Most of them have parts that were welded together by concurrent permissive legislation of several states. It is not merely the consequences of violating or failing to live up to the requirements of the state charters that are to be considered; all interstate railroads are now forbidden to "abandon all or any portion of a line of railroad or the operation thereof" without the approval and certified consent of the Commission. If they should attempt to quit without such consent, the Attorney General, or the Commission, or a state commission, or any party in interest, is authorized to go to court and get an injunction on showing an attempted or intended abandonment of operation. Title 4 of the Transportation Act of 1920; Comp. St. Supp. 1923, § 8563, (18)–(20).

From the foregoing considerations it is apparent that interstate railroads are bound hand and foot. They have no choice as to what they will sell or for how much. They dare not quit. They are forbidden by law to quit. They cannot exert any sort of "economic pressure" in any sort of "industrial combat." They are powerless to use the "lockout" as a weapon against their employees.[1] Turning back now to the definition of a "strike," we see that, in an industrial combat, wherein the rights of the combatants are equal and reciprocal, the strike was only tolerated as a weapon on one side because the other side was armed with an equivalent weapon. Mutual freedom is the vitals of "collective bargaining" or any bargaining. In our judgment, the very principles on which the strike was originally found to be lawful now require that the Interstate Commerce Act and title 4 of the Transportation Act be interpreted and applied to forbid an assault upon a helplessly fettered opponent and to forbid the calling of such an act a combat.

It follows that plaintiffs in error were not engaged in a lawful strike.

---

[1] The fact that the Commission could not constitutionally deny an interstate railroad the right to abandon its line or a part thereof if there was no reasonable prospect of profitable operation in the future (Bullock v. R. R. Comm. of Florida, 254 U. S. 513, 521, 41 Sup. Ct. 193, 65 L. Ed. 380) does not militate against the position that an interstate railroad is forbidden by law to use the "lockout."

Their acts toward the railroad company were necessarily the same as those of strangers. Consequently they were not qualified to demand a jury trial under the Clayton Act.

This does not mean that, because employees cannot conduct lawful strikes against interstate railroads under the law as it now stands, they have become enslaved or in any way bound to work. Arthur v. Oakes, 63 Fed. 320, 11 C. C. A. 209, 25 L. R. A. 414. It merely means that when they refuse to work, either singly or collectively, they sever themselves from their jobs. They are then at perfect liberty to seek new employment. .

[6] (2) Another ground supports the conclusion that plaintiffs in error, on and after July 1, 1922, were not employees carrying on a controversy over wages and working conditions with the railroad company as their employer, and therefore were not entitled to invoke the benefit of the jury provision in the Clayton Act.

In its bill of complaint the railroad company set forth the substance of title 3 of the Transportation Act of 1920. Comp. St. Supp. 1923, § 10071¼, subds. ee–jjj. That part of the act creates the Railroad Labor Board and treats of the duties of the board in reference to wage and other disputes between interstate railroads and their employees. On May 25, 1922, the board rendered its decision fixing wages for employees in the shop crafts, to become effective on July 1, 1922. The railroad company accepted said decision, and intended and attempted to comply therewith; but plaintiffs in error and the other employees in the shop crafts refused to abide by the decision, and in defiance of the board abandoned the service of the railroad company.

Although beyond a moral sanction there is no penalty for violating the board's decision, except the board's publication of its opinion that its decision is being violated (title 3, § 313, of the Act, Comp. St. Supp. 1923, § 10071¼iii; Pennsylvania R. Co. v. United States Railroad Labor Board (Feb. 19, 1923) 43 Sup. Ct. 278, 67 L. Ed. ——, that part of the act declares a public policy which should be accepted and made effective in civil actions, irrespective of the character and amount of punishment prescribed for the offenses viewed as crimes or misdemeanors.

In our judgment, therefore, the so-called strike of the shop crafts unions was a controversy with, or a strike against, the Labor Board as an instrumentality of our national government, and is to be classed with the insurrection of the Boston policemen.

Here, again, there is neither enslavement nor legal compulsion to work; the men are at liberty to quit, singly or collectively, but must recognize that they no longer are employees of their former employer.

[7] (3) Accepting for the sake of the argument the contention of plaintiffs in error that they were entitled to invoke the jury provision of the Clayton Act, nevertheless their demand for a trial by jury was rightly denied because that part of the act is unconstitutional.

Article 3, § 1:

"The judicial power of the United States shall be vested in one Supreme Court and in such inferior courts as the Congress may from time to time ordain and establish."

. 291 F.—60

Article 3, § 2, par. 1:

"The judicial power shall extend to all cases in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be 'made, under their authority."

Article 3, § 2, par. 2, after defining the original jurisdiction of the Supreme Court, proceeds:

"In all the other cases before mentioned the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make."

The original jurisdiction of the Supreme Court comes directly from the Constitution and cannot be enlarged or diminished by Congress. The appellate jurisdiction of the Supreme Court can be limited as to subject-matter and regulated as to procedure. Appellate jurisdiction assumes the existence of trial courts. And Congress in ordaining trial courts and other courts inferior to the Supreme Court can limit their jurisdiction as to subject-matter and regulate their procedure. Viewing the inferior courts, and also the Supreme Court as an appellate tribunal, we see that Congress, the agency to exercise the legislative power of the United States, can, as a potter, shape the vessel of jurisdiction, the capacity to receive; but, the vessel having been made, the judicial power of the United States is poured into the vessel, large or small, not by Congress, but by the Constitution.

Some terms in the Constitution are, and were meant to be, relative. For example, "due process of law" and "liberty," in the Fifth and Fourteenth Amendments, were not intended to limit the police power forever to those matters which it had laid hold upon when those amendments were adopted. Other terms are, and were meant to be, absolute. They cover now exactly the same ground they did when adopted, without possibility of enlargement or diminution except by amendment. For example: "Habeas corpus," in article 1, § 9; "trial by jury," in article 3, § 2, par. 3, and in the Sixth and Seventh Amendments; "cases in law," "cases in equity," "criminal prosecutions," "indictment of a grand jury," "suits at common law," in article 3, § 2, par. 1, and in the Fifth, Sixth, and Seventh Amendments.

Congress may limit the jurisdiction of an inferior court to hearing criminal cases, or to designated kinds of criminal cases; but Congress cannot constitutionally deprive the parties in such a court of the right of trial by jury. The same is true of trials of "cases in law." And the jury in such a civil or criminal court must comprise 12 jurors and their verdict must be unanimous. Similarly Congress may limit the jurisdiction of an inferior court to hearing "cases in equity," or to designated kinds of ·equity cases; but Congress cannot constitutionally deprive the parties in an equity court of the right of trial by the chancellor. Martin v. Hunter's Lessees, 1 Wheat. 331, 4 L. Ed. 97; In re Atchison (D. C.) 284 Fed. 604.

A proceeding called a contempt proceeding, perhaps not very happily, is the means of executing the decree in equity. A plaintiff has been found by a decree in equity to be entitled to enjoy certain prop-

erty rights without being further disturbed by the defendant. But the defendant persists. To enforce the decree the court may try the deterrent effect of fine, or imprisonment for a definite period, or may give the plaintiff civil relief by keeping the disturber away until the plaintiff is in the secure enjoyment of his property rights. Either way, the vindication or enforcement of the decree must be held to be an inherent power of the equity court, a power within the power to render the decree. In re Debs, 158 U. S. 564, at pages 593–596, 15 Sup. Ct. 900, 39 L. Ed. 1092.

The judgments are affirmed.