Ray C. BALLANTYNE, Appellant,
v.
UNITED STATES of America,
Appellee.
No. 15822.

United States Court of Appeals
Fifth Circuit.
Oct. 10, 1956.

Louis W. Graves, Jr., James R. Cornish, Joseph W. Cash, Houston, Tex., for appellant.

Malcolm R. Wilkey, U. S. Atty., James T. Dowd, Asst. U. S. Atty., Houston, Tex., for appellee.

Before RIVES, CAMERON and BROWN, Circuit Judges.

RIVES, Circuit Judge.

This appeal is from two judgments of conviction for contempt of court, upon

each of which the appellant received a sentence of six months imprisonment. The second sentence was to run concurrently with the first. Each conviction was for the appellant's refusal to obey an order or orders of the court requiring him to answer certain questions propounded to him as a witness before the grand jury, notwithstanding his claim that his answers to the questions might tend to incriminate him.

In view of the importance of the matter and at the risk of being prolix, we set forth at some length the appellant's status in the community, the setting in which the questions were asked, and the legal procedure. The appellant was Vice-President and operating head of Balco, Inc., a corporation engaged in construction work and in the building of roads and bridges. He had a family consisting of a wife and one child, belonged to a church in which he took an active part, to one social club, had never been accused of any crime, nor had he knowingly associated with criminals. It is against that excellent background and reputation that the appellant was guilty of conduct so questionable as to cause him to invoke the protection of the Fifth Amendment.

The beginning of the controversy was an examination of the income tax returns of Balco, Inc. in connection with an investigation of "some third parties." The examining agent, Mr. Taylor, testified, "There were numerous cash withdrawals made, which if we could not determine them to have gone to a third party, under such examination they would have to be constructive dividends to Mr. Ballantyne." All of these cash withdrawals were on checks made payable to Balco, Inc. from either the City of Pasadena or the City of LaPorte, Texas. A few relatively small checks were cashed directly without being deposited to the credit of Balco, Inc., and, during the years 1951, 1952 and 1953, approximately $50,000.00 was withheld from checks which were deposited, the deposit slips listing the amounts of the checks and the cash withheld, which was always in round numbers of so many thousand dollars. The checks were endorsed for the corporation by the appellant, and the deposit slips were made out in the appellant's handwriting. Mr. Taylor testified that, "As agent for the corporation he was the last known person to have custody of the money." He, of course, called upon Ballantyne for an explanation of the withdrawals.

"Q. In as near the language as Mr. Ballantyne used, give us everything he said to you in that respect.
A. Quoting as near as I can recall: 'To tell you that I would be ruined financially. I would have to leave town.'"

Again, in explanation of three particular items of cash withdrawals, Ballantyne used only one word "graft."

In due course, Agent Taylor reported to George A. Stephen, Group Supervisor of the Intelligence Division of the Internal Revenue Service, stationed at Houston, Texas, that Ballantyne had told him that the withdrawals were for graft. Mr. Stephen testified that, "Mr. Ballantyne's statement to Mr. Taylor seemed to have a definite relationship" with "certain information (which) had been brought to our attention by the Internal Revenue agents concerning possible income of certain individuals," and, an "investigation that was already in progress." Accordingly, Stephen had Ballantyne subpoenaed to testify concerning the disposition of the withdrawals.

The Intelligence Division was obviously seeking to ascertain the recipients of the alleged prior payments and Mr. Stephen testified that they were not investigating Mr. Ballantyne for income tax fraud. At the same time, Mr. Stephen conceded that,

"The only knowledge I have about any bribery at all is the statements Mr. Ballantyne made when he appeared in our office, and the statement that Internal Revenue Agent Taylor told me was made to him by Mr. Ballantyne, that the money had gone for graft payments to city officials."

Ballantyne was accompanied to this examination by his attorney. Initially, his attorney explained to the special agent,

"that he though he had an out for Mr. Ballantyne in that he could plead the Fifth Amendment, because it might possibly incriminate him under state law to testify.

"Q. What state law, if any, did he make particular reference to? A. Bribery of public officials."

After the special agent had explained to the attorney that the Fifth Amendment to the Constitution did not protect against disclosures of state crimes, the attorney replied, "Well, there is another possibility that there might be incrimination for tax evasion."

Ballantyne declined to answer any questions as to the disposition of the withdrawals, on the ground that the answers might tend to incriminate him, assigning both the Fourth and Fifth Amendments, but did engage in some off the record conversations.

"Q. What did Mr. Ballantyne tell you in these off the record remarks during the time the sworn statement was being taken? A. He told the agents present and made the statement in the—during the course of the proceedings that he was just a small fish, and that we weren't after the real parties. That there were other ones that had made bigger payments than he had ever made, and that type of thing was pretty universal, and that it would ruin him to furnish any information concerning any payments of graft."

Mr. Stribling, another special agent present, remembered the off the record conversation as follows:

"Q. Can you tell us in Mr. Ballantyne's own words, as close as possible, just what he said? A. Well, he said that such payments were a usual and normal thing; that they were made from Washington on down, and that in order to remain in business competitively that it was simply necessary for him to do that."

Ballantyne was next subpoenaed to appear before a federal grand jury at Houston, Texas, on September 28, 1955. Before the grand jury, he gave his business and social background and testified that he had no other source of income except Balco, Inc. The United States Attorney then asked him,

"Q. All right. Have you reported all of that income? A. I have, yes.

   *    *    *    *    *    *

"Q. Have you ever received any little gratuities on the side, any side pocket payments that went into your pocket, of a hundred dollars or more, which were not turned over to your accountant and to the best of your knowledge reported on your income tax return? A. Not that I know of."

Appellant was then confronted with most of the deposit slips and checks which disclosed the cash withdrawals. He then declined to testify whether he kept the cash withheld for his own personal use, or what disposition he made of it, invoking the Fourth and Fifth Amendments "on the ground that there is a possibility that it might incriminate me under the federal laws." When the United States Attorney undertook to require him to be definite as to what crime he might be prosecuted for, appellant replied,

"Well, all right, there is one thing, that one of the federal revenue men did threaten to hold me responsible for all this money, and prosecute me on income tax evasion. * * * Well, it is just the—just the federal laws of perjury. There's ten million of them. You just stated that there are shelf after shelf of books on it. I don't know; I am an engineer, I am not a lawyer."

He also declined to testify concerning his interview with Internal Revenue Agent Taylor and his subsequent examination before the special agent of the Intelligence Division of the Internal Revenue Service. He admitted that Balco, Inc. had performed 12 to 15 contracts with Pasadena, the gross amounts of which varied from $2,000.00 to $300,-000.00, and two contracts with LaPorte and that the checks to Balco, Inc. were

transmitted to him and that he handled the depositing of the checks.

Chief Judge Magruder for the First Circuit has well pointed out that "The Congress has not made it a separate and distinct offense for a witness before a grand jury to refuse to answer any question pertinent to the matter under inquiry. * * * the grand jury must depend upon the court to punish contumacious witnesses. The criminal contempt, if it be one, is contempt of the authority of the court." Carlson v. United States, 1 Cir., 209 F.2d 209, 212, 213.

Accordingly, the United States Attorney reported to the court that the appellant had refused to answer the questions and requested that the court order him to make answers. At the request of the appellant's attorney, the court postponed the hearing on that request until the following day, September 29, 1955, at which time the proceedings before the grand jury had been transcribed. After a very full and patient hearing at which appellant's counsel introduced the testimony of the Internal Revenue agents, disclosing substantially the facts which have already been recited, the court directed appellant to return to the grand jury and answer the questions.[1]

Accordingly, on the succeeding day, September 30, 1955, appellant was again sworn as a witness before the grand jury and several of the questions propounded to him on his previous examination were again asked him, each of which he refused to answer on the ground that the answer might tend to incriminate him, invoking the Fifth Amendment. The United States Attorney then asked him, "If I went through and asked you those same exact questions verbatim as are

shown in the transcript filed in the Court, would you continue to invoke the Fifth Amendment." Appellant replied, "I refuse to answer the question on the grounds that to do so may tend to incriminate and degrade me, and I base my refusal on the rights of the Fifth Amendment to the Constitution of the United States." The United States Attorney then told him,

"Mr. Ballantyne, it is our opinion that you have refused to obey a lawful and considered order of the Chief Judge of the District Court for the Southern District of Texas, in that you have refused to answer the specific questions, or any other questions related thereto, which you were ordered to answer yesterday."

Accordingly, on the afternoon of the same day, September 30, 1955, appellant was again hailed before the court, the United States Attorney stating to the court:

"Mr. Ballantyne appeared at 11:00 o'clock in response to the Court's order, but declined to answer any and all questions which he had previously declined to answer.

"The government therefore asks that Mr. Ballantyne be charged with criminal contempt, and after notice and hearing that he be punished for such criminal contempt by imprisonment in the custody of the United States Marshal for such definite period of time as the Court may see fit, and that such definite period of time as the Court sees fit be all or part of it remitted if Mr. Ballantyne purges himself of his contempt by obeying the lawful and considered order of the Court.

1. "The Court: Well, under the state of the record I believe the case more nearly in point is the case of Brown v. Walker, 161 U.S. 591 [16 S.Ct. 644, 40 L.Ed. 819], in which the Court held that every good citizen is bound to aid in enforcing the law, and he has no right to use his privilege to shield others under the pretext of protecting his name.

"So believing, why, I will order the witness, R. C. Ballantyne, to appear before

the grand jury of the Southern District of Texas here in this court house, I believe on the third floor, at 11:00 o'clock tomorrow morning, and answer questions that have been propounded to him and set forth in the transcript of the testimony, of his testimony, before that body, which is a matter of record in this hearing at this time.

"Is that clear, Mr. Ballantyne?"

"The charge is criminal contempt, for failure to answer the questions before the grand jury in response to the due and lawful order of the Court. Mr. Ballantyne is present here with his attorney."

On the request of appellant's attorney, the hearing was postponed until the following Tuesday, October 4, with the following colloquy as to the nature of the hearing:

"Mr. Wilkey: Your Honor, I will ask the Court to state for the defendant and his counsel that this proceeding is in the nature of a show cause, for the defendant to show cause why he should not be cited and punished for criminal contempt.

"The Court: Do you understand that, counsel?

"Mr. Cornish: Your Honor, I understand this would be considered as a civil contempt matter, although the penalty can be either fine or conviction?

"The Court: That's right. I don't know that there is any limit as to either the amount of the fine, if there should be a fine, or the amount of the imprisonment, if there should be imprisonment. It can't be both; it has to be one or the other.

"Mr. Cornish: My understanding is it is a civil proceeding.

"Mr. Wilkey: Your Honor, there is some confusion here. The charge made by the government is one of criminal contempt. That is the charge which the defendant will be called upon to answer on Tuesday.

"The Court: All right.

"Mr. Cornish: Is that Your Honor's order, that it is a criminal contempt?

"The Court: Well, I don't know that it is necessary for me to determine that now. I will let you argue the question. But regardless of whether it is criminal or civil, either or both, the setting is definite, the time and place definite, and the fact that it is a criminal contempt hearing is something I will determine at that time."

At the October 4 hearing, appellant appeared with additional counsel. He requested "a clear specification of whether or not, or a ruling as to whether or not, this is a civil or criminal contempt charge." The court replied, "Well, you were not present at the time of the original hearing. Your co-counsel was, and the District Attorney stated at that time that this was a criminal contempt proceeding." Appellant's new counsel then stated that though he recognized that under the rules notification of the charge might be oral, appellant was entitled to have a clear specification of what questions he was specifically required by the court to answer and what answers he refused to make. The court then adjourned the hearing in order that appellant could be returned before the grand jury and again asked the precise questions that were asked him in the original hearing.

Again, appellant went before the grand jury on that same day, October 4, when all of the questions asked him on the original hearing of September 28 were repeated, and to the material ones he made like responses declining to answer on the ground that the answers might incriminate him and invoking the protection of the Fifth Amendment.

On his subsequent return later in the day before the court, appellant's new counsel insisted that "this is a different charge than the one we had beforehand." The United States Attorney took the position that, "there are several questions in the hearing before the grand jury on September 30 which are exactly the questions propounded before the grand jury on September 28, in which those specific questions were asked in the same words to the defendant," and requested that the court proceed on its order to answer two of such questions.[2]

2. "Q. Mr. Ballantyne, on that occasion you were interrogated in regard to a deposit slip identified as Grand Jury Exhibit 1, in the amount, the gross amount of $18,552.60, with the notation 'less cash, $5,000.00,' then the next deposit, $13,

The court then directed, "Proceed on that then, without reference to the other, and without prejudice to the right to bring him back on the question of what occurred today." At the conclusion of that hearing the court found appellant guilty of contempt.[3] Formal findings of fact and conclusions of law and a formal judgment and sentence were thereafter entered. Ballantyne promptly appealed from this judgment of conviction.

Thereafter, on October 14, 1955, the Government filed an additional motion for a show cause order and criminal contempt, which the court granted.[4] As a result of that hearing, the court entered its findings of fact,[5] again found appellant guilty of contempt for disobeying the order or orders of the court by refusing to answer the questions, and imposed an additional sentence of six months to run concurrently with the previous sentence.

As to his first conviction for contempt, the appellant contends: (1) that the court did not comply with Rule 42, Federal Rules of Criminal Procedure, 18 U. S.C.A.,[6] in that it did not "state the essential facts constituting the criminal

552.60; and in regard to that deposit slip and the five thousand dollar item thereon, you were asked:

" 'In regard to the five thousand dollar item, sir, did you yourself keep that for your own personal use?'

"I am asking you that question again, sir. What is your answer? A. I refuse to answer the question on the grounds that to do so may tend to incriminate and degrade me, and I base my refusal on the rights of the Fifth Amendment to the Constitution of the United States.

"Q. It is true, is it not, that at the time you were interviewed by the Internal Revenue agents, you, on either this or other deposit slips similar thereto, you emphatically denied that you personally had kept the cash items listed on the deposit slips? Is that not correct? A. I refuse to answer that question on the ground that to do so may tend to incriminate and degrade me, and I base my refusal on the rights of the Fifth Amendment to the Constitution of the United States."

3. "I find beyond a reasonable doubt that you, Ray C. Ballantyne * * * wilfully, deliberately and not in good faith disobeyed the order of this Court in refusing to answer certain questions asked you in a proper proceeding before the grand jury of this district and this division now in session.

"I further find that said questions and each of them asked of the said Ballantyne, particularly the two in question here, presented no real, reasonable or real danger of further incrimination.

"I therefore find the said Ray C. Ballantyne in criminal contempt of this Court, and hereby commit him to the custody of the United States Marshal of the Southern District of Texas for imprisonment for a period of six months.

"Committed."

4. "Ordered that Ray C. Ballantyne appear before this Court at 10 a. m. o'clock, 31 October 1955, and show cause why the said Ray C. Ballantyne should not be held in criminal contempt for the reason that the said Ray C. Ballantyne did willfully, deliberately, and not in good faith disobey the considered and lawful orders of this Court made on September 29, 1955, and October 4, 1955, by refusing to answer certain questions asked him in a proper proceeding before the Grand Jury of this District and Division now in session, the said questions having been previously asked the said Ray C. Ballantyne on September 28, 1955, and the Court having found after due notice and hearing on September 29, 1955, that the said questions, and each of them, asked of the said Ballantyne, presented no reasonable or real danger of incrimination. And in furtherance thereof, it is * * *."

5. "On October 4, 1955, the witness Ray C. Ballantyne appeared before the grand jury at Houston, Texas, in response to subpoena and orders of the Court issued September 29th and October 4th, and thereupon refused to answer twenty questions propounded to him, which had been previously asked him on September 28th. On that day the witness originally refused to answer twenty-six questions. Two of these were reasked on September 30th, and on these I ruled October 4th. Four of the original twenty-six the witness answered before the grand jury on October 4th, but to twenty questions on which I am now ruling he refused to answer. The text of the twenty questions and (numbered as in the original Grand Jury transcript) answers are as follows: * * *."

6. "Rule 42. Criminal Contempt

"(a) Summary Disposition. A criminal contempt may be punished summarily if the judge certifies that he saw or heard the conduct constituting the contempt and

contempt charged and describe it as such", (2) that the appellant was entitled to a jury trial, (3) that, under the protection of the Fifth Amendment, appellant was not in contempt for refusing to answer the questions.

As to his second conviction, the appellant makes the same contentions, and also that the district court had been deprived of jurisdiction by the prior appeal to this Court and that the second contempt was barred by the first.

### I. Sufficiency of the Notice.

■ We think the record shows adequate and substantial compliance with the spirit of Rule 42(b) [Footnote (6), supra], and that throughout each proceeding appellant's counsel was sufficiently informed of the basis for each charge, both from other pertinent statements of the court, and by virtue of his admitted possession before each hearing of the complete transcript of all prior grand jury proceedings made the basis of the contempt charges. In this posture of the record, and appellant being charged with knowledge of those questions which he had refused to answer under claimed

protection of his constitutional privilege, we are constrained to view any lack of technical specificity by the court in stating the offense as harmless, not affecting appellant's substantial rights or constituting a deprivation of due process.[7]

### II. Right to Jury Trial.

■ Appellant's insistence that he was entitled to a jury trial is labeled by appellee as a "distinct afterthought", and we agree. There was no demand for a jury as required by the applicable statute, 18 U.S.C.A. § 3691. See Adams v. United States, 317 U.S. 269, 275, 63 S. Ct. 236, 87 L.Ed. 268; Couts v. United States, 8 Cir., 249 F. 595, 597. Indeed, the issue is raised for the first time on this appeal. Unless there be a *constitutional*[8] right to trial by jury in contempt proceedings of this kind which has not been waived, then the question of appellant's right to jury trial has not been preserved for review upon this appeal. In any event, that question is immaterial if we are correct in our holding, presently to be stated, that, as a matter of law, the appellant was protected by the Fifth Amendment in his refusal to obey

that it was committed in the actual presence of the court. The order of contempt shall recite the facts and shall be signed by the judge and entered of record.

"(b) *Disposition Upon Notice and Hearing.* A criminal contempt except as provided in subdivision (a) of this rule shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the United States attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest. The defendant is entitled to a trial by jury in any case in which an act of Congress so provides. He is entitled to admission to bail as provided in these rules. If the contempt charged involves disrespect to or criticism of a judge, that judge is disqualified from presiding at the trial or hearing except with the defendant's consent. Upon a verdict or finding of guilt

the court shall enter an order fixing the punishment."

7. Compare United States v. United Mine Workers, 330 U.S. 258, 296, 67 S.Ct. 677, 91 L.Ed. 884; In re Michael, 3 Cir., 146 F.2d 627, 628, reversed on other grounds 326 U.S. 224, 66 S.Ct. 78, 90 L. Ed. 30; United States v. Patterson, 2 Cir., 219 F.2d 659, 662, n. 4; International Union, United Mine Workers of America, v. United States, 85 U.S.App.D. C. 149, 177 F.2d 29, 36.

8. See the dissenting expressions of Mr. Justice Black, concurred in by Mr. Justice Douglas, in Sacher v. United States, 343 U.S. 1, 20, 89, 72 S.Ct. 451, 96 L.Ed. 717, and as tending to the opposite persuasion see In re Debs, 158 U.S. 564, 594, 15 S. Ct. 900, 39 L.Ed. 1092; Bessette v. W. B. Conkey Co., 194 U.S. 324, 326, 24 S. Ct. 665, 48 L.Ed. 997; Myers v. United States, 264 U.S. 95, 103, 44 S.Ct. 272, 68 L.Ed. 577; Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L. Ed. 162; Ex parte Grossman, 267 U.S. 87, 117, 118, 45 S.Ct. 332, 69 L.Ed. 527; United States v. United Mine Workers, 330 U.S. 258, 298, 67 S.Ct. 677.

the order or orders of the court requiring him to answer the questions.

III. *The Merits of Appellant's Claim to the Protection of the Fifth Amendment.*

A most difficult question is presented as to how far the court is bound to recognize the witness' claim that his answers may tend to incriminate him. The subject is adequately treated in Vol. VIII of Wigmore on Evidence (3rd ed.) § 2271 et seq., where the author notes that the true rule was first set forth by Chief Justice John Marshall in Aaron Burr's trial, United States v. Burr, Fed.Cas.No. 14,692e, 1 Robertson's Reports 243, as follows:

" 'When two principles come in conflict with each other, the court must give them both a reasonable construction, so as to preserve them both to a reasonable extent. The principle which entitles the United States to the testimony of every citizen, and the principle by which every witness is privileged not to accuse himself, can neither of them be entirely disregarded. They are believed both to be preserved to a reasonable extent, and according to the true intention of the rule and of the exception to that rule, by observing that course which it is conceived courts have generally observed. It is this: When a question is propounded, it belongs to the court to consider and decide whether *any* direct answer to it *can* implicate the witness. If this be decided in the negative, then he may answer it without violating the privilege which

is secured to him by law. If a direct answer to it *may* criminate himself, then he must be the sole judge what his answer would be. The court cannot participate with him in this judgment, because they cannot decide on the effect of his answer without knowing what it would be; and a disclosure of that fact to the judges would strip him of the privilege which the law allows, and which he claims.' " Vol. VIII of Wigmore on Evidence (3rd ed.) § 2271, pp. 405–406.

This language of Chief Justice Marshall can be consistently reconciled with the present day Court's expressions in Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1108, and the liberal rule conferring broad protection upon an accused invoking his constitutional privilege against self-incrimination applied by this Court in Marcello v. United States, 5 Cir., 196 F.2d 437, and Poretto v. United States, 5 Cir., 196 F.2d 392.[9]

In announcing its holding in Hoffman v. United States, supra, the Court said: "In this setting it was not *'perfectly clear,* from a careful consideration of all the circumstances in the case, that the witness is mistaken, and that the answer[s] *cannot possibly* have such tendency' to incriminate." 341 U.S. at page 488, 71 S.Ct. at page 819.[10]

The district court referred to appellant's statements to the agents and his testimony at his first grand jury appearance, and held therefrom that, in the absence of proof beyond a reasonable doubt to the contrary, the court must assume that appellant had paid all income taxes due from him.[11] Such prior statements

9. During the intervening years from Chief Justice Marshall's decision in Aaron Burr's case until the advent of Hoffman v. United States, 341 U.S. 479, 71 S.Ct. 814, and cases in accord, the Court appears to have departed in numerous instances from any such broad construction of the privilege. See and compare, Brown v. Walker, 161 U.S. 591, 599–600, 16 S. Ct. 644, 40 L.Ed. 819; Mason v. United States, 244 U.S. 362, 37 S.Ct. 621, 61 L. Ed. 1198; Rogers v. United States, 340 U.S. 367, 71 S.Ct. 438, 95 L.Ed. 344;

Blau v. United States, 340 U.S. 159, 71 S.Ct. 223, 95 L.Ed. 170.

10. It should be noted that the emphasis is that of the Court itself.

11. "This, in my opinion, constitutes a specific denial under oath that the witness Ballantyne personally kept or received the benefit of the corporation funds represented by the 'less cash' items. As such, it confirms his previous statements made to the revenue agents that the 'less cash'

and testimony were, of course, an important part of the background or setting against which the court must determine whether his answers could possibly have a tendency to incriminate the appellant. Of not less importance, however, as a part of such background or setting, was the fact that appellant asserted both expressly and by implication that he had sunk so low in the moral scale as to pay graft, to bribe public officials. Thereby, whether unwittingly or not, he shed his cloak of respectability, and proved himself a man of bad character who might not be above evading his income taxes and concealing or attempting to conceal his guilt by false or extravagant claims of graft. Like so many others who hold themselves out as purchasers of votes or influence or purveyors of bribes, he may have let the money, or a part thereof, stick in his own pockets. Compare the similar factual situation in Kiewel v. United States, 8 Cir., 204 F.2d 1.

In our opinion, the appellant was not absolutely concluded by his claims to the Internal Revenue agent that the withdrawals were for graft. As we said in Poretto v. United States, supra, 196 F.2d at page 394:

"The constitutional privilege attaches to the witness in each particular case in which he is called upon to testify, without reference to his declarations at some other time or place or in some other proceeding."[12]

In In re Neff, 3 Cir., 206 F.2d 149, 152, 36 A.L.R.2d 1398, it was held that a waiver of the privilege before the Grand Jury did not carry through to the subsequent trial. As between appellant's testimony at his first appearance before the Grand Jury on September 28 in which

the United States Attorney extracted from him the general answers that he had reported all of his income, and did not know of any additional "little gratuities on the side, any side pocket payments that went into your pocket", and his subsequent testimony before the Grand Jury on September 30, and again on October 4, the cleavage is possibly not so clear, though on each appearance he was sworn anew. In any event, the United States Attorney could not, by thus skillfully securing from appellant a general claim of innocence, preclude him from thereafter relying upon his constitutional privilege when confronted with specific withdrawals. Apt to such a situation is the language of the Supreme Court in Emspak v. United States, 349 U.S. 190, 198, 75 S.Ct. 687, 692, 99 L.Ed. 997: "To conclude otherwise would be to violate this Court's own oft-repeated admonition that the courts must 'indulge every reasonable presumption against waiver of fundamental constitutional rights.' "

The government's assumption, concurred in by the district court, that the appellant was concluded by his statements to the agent and his testimony at the first Grand Jury appearance, would effectively beg the question as to whether it was *perfectly clear* that the answers *cannot possibly* have a tendency to incriminate the appellant for violation of the tax evasion statutes, 26 U.S.C.A. § 145, I.R.C., 1939. Clearly, if appellant lied to the agent and later to the Grand Jury, and that is quite possible, then appellant, instead of, or perhaps along with some hypothetical dishonest official or officials, is guilty of crime which his answers would disclose. We think that that possibility must be taken into considera-

---

items went, not to himself, but to certain unnamed individuals for 'graft'.

"Unless I assume the witness Ballantyne guilty of perjury before the Grand Jury, I must assume that he has paid his income taxes for the years in question, that he himself did not personally keep or receive the benefit of the unexplained cash withheld. Legally, since I did not hear this testimony, I must believe he told the truth while under oath unless

proven to me beyond a reasonable doubt that he did not. No man is assumed guilty of perjury, to the contrary he is presumed innocent unless proven guilty.

"That being so, considering along with his previous statements to the agents, * * *."

12. See also, Marcello v. United States, 5 Cir., 196 F.2d 437, 445; United States v. Steffen, D.C.Cal., 103 F.Supp. 415.

tion in ruling upon appellant's claim of protection under the Fifth Amendment.

Appellant's counsel lists many other statutes of which he claims that appellant might reasonably have apprehended self-incrimination.[13] We need not make a detailed examination of such various possibilities, for it seems clear to us that his answers truthfully made might have proven him criminally responsible for violating income tax laws. That being true, the Fifth Amendment afforded him a haven of refuge however dishonest he may have been, for the privilege extends to the guilty as well as the innocent. Helton v. United States, 5 Cir., 221 F.2d 338, 342. The judgments are, therefore, reversed with directions that the appellant be discharged.

Reversed.

CAMERON, Circuit Judge (concurring in part and in part dissenting).

I concur in the reversal of the judgments of the Court below, but not in the discharge of appellant nor the reasons upon which that action is based in the majority opinion, I would remand the case for trial by jury.

### I.

If the Judge had jurisdiction to try appellant, I think his findings are amply supported by the evidence. In the contempt hearings before him the Government introduced only the transcripts of appellant's testimony before the grand jury. That testimony, standing alone, would, in my opinion, have sustained a finding by the trial Judge that appel-

lant had no cause to fear prosecution for income tax evasion or to apprehend that the answers he refused to give would tend to incriminate him of such a charge.

Appellant, himself, introduced as his witnesses three agents of the Internal Revenue Service and proved by them that appellant and his lawyer had freely stated to them that the money in question was not his money and was not retained by him; but was paid by him as an agent of Balco, Inc. to certain city officials to reward them for employing Balco in connection with certain public works. In the various conferences preceding presentation to the grand jury both appellant and his lawyer staked reliance solely upon the claim that the questions, if answered, would tend to make appellant liable to prosecution for violation of state laws, and the claim of possible federal involvement was not made until the invalidity of the former claim had been pointed out by the federal officials.

The showing before the District Judge was strong indeed and he was fully justified in reaching the conclusions of fact announced by him. But I do not think he had jurisdiction to try the fact issues, but think they should have been submitted to a jury.

### II.

The trial Judge, sitting as judge of the facts and the law, found appellant guilty of acts which violated not only the Court's order, but federal statutes [1] as well as state statutes, e. g., 1 Vernon's Texas Penal Code, Arts. 158, 160, 167. So finding, he entered judgments taking

---

13. Violation of the Statute requiring informational returns, Sec. 147, I.R.C.1939, 26 U.S.C.A. § 147; violation of the False Statement Statute, Title 18 U.S.C.A. § 1001; violation of the Conspiracy Statute, Title 18, U.S.C.A. § 371; violation of the provisions of the Aider and Abettor Statute, Title 18 U.S.C.A. § 2; and violation of the Specific Aider and Abettor Statute of the Internal Revenue Code, Sec. 3793, 1939, 26 U.S.C.A. § 3793. Violation of the Gift Tax Statute, I.R.C., Sec. 1006 and Sec. 1024(a) and (b), 26 U.S.C.A. §§ 1006, 1024(a, b); violation of the Verification of Returns Statute, I.R.C. 3809, 26 U.S.C.A. § 3809; incurring the

fraud penalty under I.R.C., 1939, Sec. 293(b), 26 U.S.C.A. § 293(b). Violation of 18 U.S.C.A. § 1621, General Perjury Statute.

1. E. g., 18 U.S.C.A. §§ 1503 and 1505 (and cf. Wilder v. United States, 4 Cir., 1906, 143 F. 433), which statutes originated as § 2 of the Act of March 2, 1831, 4 Stat. 487, Rev.Stat. § 725, which was the Contempt Act upon which most of the decisions of the Supreme Court have been based. § 1 of that Act is now 18 U.S.C.A. § 401. And cf. also the Conspiracy Statute, 18 U.S.C.A. § 371, and the Perjury Statutes, 18 U.S.C.A. § 1621 et seq.

appellant's liberty from him. It is abhorrent to Anglo-Saxon justice as applied in this country that one man, however lofty his station or venerated his vestments, should have the power of taking another man's liberty from him.

Society has always permitted one exception,—the limited right of courts to punish for contempts. But that exception has been grudgingly granted,[2] and has been held down uniformly to the " ' "least possible power adequate to the end proposed." ' "[3]

### III.

The limitations of that power have been drawn closer and closer through the years and it is clear now that a judge can impose imprisonment for contemptuous conduct which constitutes also a crime only when such conduct takes place in his presence. The early decisions of the Supreme Court [4] were disposed to lodge broader powers in the judge; but a study of the history of contempt trials and the more recent decisions reveals that all agencies dealing with contempt procedures have combined in a steady progress towards stricter limitations upon the power of judges to punish contempts and broader observance of accused's constitutional rights.

### IV.

(a) The power of American Courts to punish contempts, frequently referred to as inherent, sprang from the practice in English Courts in effect when the Constitution was adopted. That practice has uniformly relegated to "the usual criminal procedure" charges of disobedience of court orders constituting also "infractions of the law".[5] The history which gave rise to the constitutional provisions guaranteeing the right of trial by jury "is succinctly summarized in the Declaration of Independence in which complaint was made that the Colonies were deprived 'in many cases, of the benefits of Trial by Jury' ".[6]

(b) The Constitution provides,[7] "The Trial of all Crimes * * * shall be by Jury * * *." But those fresh from experiences with tyranny were not content with this general guarantee, and Amendments VI and VII were promptly adopted, the former providing: "In all *criminal prosecutions*, the accused shall enjoy the right to a speedy and public trial, by an impartial jury * * *." [Emphasis added.] The concept of a criminal "prosecution" is broader than a "trial" and the addition of the more inclusive term indicates a determination to afford the right of trial by jury to those subjected to prosecution of any sort which might result in fine or imprisonment.[8] The selection of the language of the Sixth Amendment is hardly explainable upon any other postulate.

(c) The history of legislation on the subject has demonstrated a deliberate and consistent " 'Congressional purpose drastically to curtail the range of conduct which Courts could punish as contempt.' "[9] And, on the same page, the Supreme Court pointed out that the attitude of Congress and of that Court in recent years had shown a definite determination to adhere to the thesis: " 'The exercise by federal courts of any broader contempt power than this would permit

---

2. Matusow v. United States, 5 Cir., 1955, 229 F.2d 335.

3. Cammer v. United States, 1956, 350 U. S. 399, 404, 76 S.Ct. 456, 458.

4. Including those listed in footnote 8 of the majority opinion.

5. Mr. Justice Holmes in the second Gompers case, Gompers v. United States, 233 U.S. 604, 610–611, 34 S.Ct. 693, 695, 58 L.Ed. 1115.

6. Adams v. United States, 1942, 317 U.S. 269, 276, 63 S.Ct. 236, 240, 87 L.Ed. 268.

7. Article III, Section 2, Cl. 3.

8. "Criminal Case" as used in the Fifth Amendment providing that no person shall be compelled to be a witness against himself in any criminal case has been construed generally to include every sort of proceeding which might lead to taking a person's liberty. See "The Fifth Amendment", by R. Carter Pittman, 42 A.B.A. Journal 509.

9. Cammer v. United States, supra, 350 U. S. at page 404, 76 S.Ct. at page 458.

too great inroads on the procedural safeguards of the Bill of Rights, * * * and leave determination of guilt to a judge rather than a jury.' "

The Judiciary Act of 1789 [10] conferred on courts the general power to punish for contempts, the language being the substantial equivalent of that now embraced in 18 U.S.C.A. § 401. Abuses arose under that Act [11] leading Congress to pass the Act of March 2, 1831 (footnote 1, supra) wherein a second section was added which subsequently became a part of the Criminal Code and now constitutes 18 U.S.C.A. § 1503 and § 1505. The Nye case establishes that this action of Congress manifested the purpose of relegating a broad category of offenses theretofore dealt with as contempts to the normal processes of criminal trials.

The Clayton Act of October 15, 1914,[12] as if adopting the evolution manifested by the two Gompers decisions,[13] specifically provided trial by jury to persons coming within the purview of that Act [14] when charged with violation of court decrees where the acts constituted also violation of criminal laws. And the Norris-LaGuardia Act of 1932 [15] broadened further the scope of jury trials in labor cases. Finally, by passage of the Federal Rules of Criminal Procedure [16] and the new Criminal Code of 1948,[17] Congress, using the language of the Clayton Act, has provided specifically for jury trial in all contempt prosecutions, civil and criminal, based upon violation of a court order, provided "the act or thing done or omitted also constitutes a criminal offense * * *".

It is also noteworthy that Congress requires that all prosecutions for contempt of Congress be by indictment or information and trial under the usual safeguards of ordinary criminal cases.[18]

(d) The Supreme Court has kept pace with Congress in drawing closer and closer the boundaries of the categories of contempt prosecutions which can be tried without observance of all of the safeguards of the Bill of Rights, including the right of trial by jury. We discussed some of those cases in Matusow, supra, and reversed for failure of the Court below to observe the provisions of the Bill of Rights in the conduct of contempt trial.[19]

Mr. Justice Holmes had blazed the trail towards dealing with contempt charges involving crimes as ordinary criminal cases, in the second Gompers decision.[20] And the Supreme Court, in 1941 [21] declared that the prior decisions discussed in the case had been based upon "a plain misreading of language and history * * *." Ever since that epochal decision the Supreme Court has, without exception, followed and added strength to the rule requiring "meticulous regard for those separate categories of offenses * * *, so that the instances where there is no right to jury trial will be narrowly restricted."[22]

---

10. 1 Stat. 73, 83.

11. For a full discussion of these abuses and the history of the Contempt Statutes see Nye v. United States, 313 U.S. 33, 45, 61 S.Ct. 810, 85 L.Ed. 1172 et seq.

12. 38 Stat. 738, 15 U.S.C.A. § 12 et seq.

13. Gompers v. Buck's Stove & Range Co., 1911, 221 U.S. 418, 31 S.Ct. 492, 55 L. Ed. 797, and Gompers v. United States, 1914, 233 U.S. 604, 34 S.Ct. 693, 58 L. Ed. 1115.

14. The Court of Appeals in Michaelson v. United States, 7 Cir., 1924, 291 F. 940, 942, stated that the Act was written by the labor unions for the purpose of affording special protection to that group.

15. 47 Stat. 70, now 18 U.S.C.A. § 3692.

16. Cf. Rule 42 F.R.Crim.Procedure.

17. 18 U.S.C.A. §§ 401, 402, and 3691.

18. 2 U.S.C.A. § 192.

19. The Government concedes in its brief in this case that Matusow was entitled to jury trial, but attempts to distinguish this case from Matusow's.

20. Gompers v. United States, 1914, 233 U. S. 604, 34 S.Ct. 693.

21. Nye v. United States, supra, 313 U.S. at page 51, 61 S.Ct. at page 817.

22. No case decided since Nye has shown any tendency to slow down or reverse the steps by which the current trend has

## V.

(a) While the majority opinion does not decide the question of right to jury trial, it expresses some doubt as to whether appellant had not waived the right for failure to file a request therefor. But, as stated in the majority quotation from Emspak v. United States, 349 U.S. 190, 198, 75 S.Ct. 687, 692, 99 L.Ed. 997, "the courts must 'indulge every reasonable presumption against waiver of fundamental constitutional rights.'" Appellee here does not contend that appellant waived his right to jury trial, arguing the question on the merits although referring to it as an afterthought. The fact is that appellant was never given the chance to accept or reject a jury, but was put to trial at a time when his counsel was pleading for delay in order that more complete preparation might be made. There was no waiver under established principles.[23]

(b) Except for the proviso at its end that it does not apply to cases brought or prosecuted in the name of the United States, appellant would be entitled to a jury trial under the express terms of 18 U.S.C.A. § 3691. But, under identical language, the Supreme Court held that trial by jury was mandatory in a suit brought in the name of the United States, Michaelson v. United States, 1924, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162; and cf. Gompers and Nye, supra, both prosecuted in the name of the United States.

Moreover, a strange incongruity would be presented if it should be held that protection of the Bill of Rights should be withheld from a litigant contesting with the sovereign against whose activities its terms are specifically directed, while that protection is categorically vouchsafed to a litigant at grips with a private adversary.[24]

(c) A situation such as is here presented makes a peculiar call for trial of contempt charges by a fact-finder other than the author of the order the accused is charged with disobeying. What the Supreme Court said in Murchison, supra, 349 U.S. at pages 136–137, 75 S.Ct. at page 625, about the necessity of avoiding even the probability of bias applies here as does its quotation (ib.) from Offutt that "justice must satisfy the appearance of justice." [348 U.S. 11, 75 S.Ct. 13.] It transcends recognized frailties of human nature to suppose that a judge can be free from the inclinations arising from natural pique which would be engendered by a direct refusal by the accused to obey an order freshly made by him, and the temptation to strike back which inevitably accompanies ruffled pride. Doubtless such considerations are among the factors which induced Congress to give special treatment to hearings which involve charges of violating

been established. United States v. United Mine Workers, 1947, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884, does not conflict with that statement. It was there pointed out specifically that the claim of right to jury trial was based entirely on the assertion there rejected that the trial was governed by the Norris-LaGuardia Act. It was further stated that advisory jury was waived.

The following cases further develop and strengthen the quoted principle: In re Michael, 1945, 326 U.S. 224, 66 S.Ct. 78, 90 L.Ed. 30; In re Oliver, 1947, 333 U.S. 257, 274 et seq., 68 S.Ct. 499, 92 L.Ed. 682; Sacher v. United States, 1952, 343 U.S. 1, and dissenting opinions at page 14 et seq., 72 S.Ct. 451, at page 457, 96 L.Ed. 717; Offutt v. United States, 1954, 348 U.S. 11, 75 S.Ct. 11, 99 L.Ed. 11;

In re Murchison, 1955, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942.

23. Cf. Adams v. United States, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268, and Rule 23(a), Federal Rules of Criminal Procedure.

24. After providing that a person wilfully disobeying a court order shall be prosecuted under § 3691—that is, with jury trial—where the act done is of such character as to constitute also a criminal offense under federal or state law, 18 U.S.C.A. § 402 provides:

"Such fine shall be paid to the United States or to the complainant or other party injured by the act constituting the contempt, or may, where more than one is so damaged, be divided or apportioned among them as the court may direct * * *."

court orders. Cf. 18 U.S.C.A. § 402 and § 3691.

## VI.

In my opinion we ought to dispose of this appeal upon this procedural question rather than to reverse a finding of fact by the trial Judge which tends to leave the Government in a state of impotence in its efforts to detect and punish crime.